F I L E D

NOV 2 7 2007 MB

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

NOV 2 7 2007

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Respondent, | ) | CIVIL NO. _____ |
| -vs- | ) | CRIM. NO. 01-CR-567-2 |
| | ) | |
| FRANK RODRIGUEZ, | ) | HON. JAMES F. HOLDERMAN, |
| Defendant-Movant. | ) | U.S. DISTRICT JUDGE |

MEMORANDUM OF LAW
IN SUPPORT OF MOVANT'S MOTION TO
VACATE SENTENCE UNDER 28 U.S.C. SECTION 2255

## I. Introduction

NOW COMES the defendant-movant, Frank Rodriguez ("Mr. Rodri-
guez" or "Movant"), a U.S. citizen serving a 180-month sentence of
imprisonment imposed by this Court on December 17, 2002. This mo-
tion under Title 28 U.S.C. Section 2255, filed in pro se, seeks to
move this Honorable Court to vacate, set aside, or correct the sen-
tence as imposed, because Mr. Rodriguez was denied the Fifth and
Sixth Amendment protections guaranteed to him as a birthright un-
der the Constitution of the United States of America.

Mr. Rodriguez will demonstrate in this motion that he was
denied the effective assistance of counsel ab initio, where de-
fense counsel failed to conduct any pre-trial investigation cen-
tered on determining the factual nature and scope of the criminal
conspiracy Mr. Rodriguez was charged with committing.   Consequent
to counsel's ineffectiveness, Mr. Rodriguez's due process rights
under the Fifth Amendment were violated when he, on counsel's ad-
vice, unknowingly and involuntarily entered a plea of guilty to

(1)

07CV6661
JUDGE HOLDERMAN
MAGISTRATE JUDGE NOLAN

conspiracy to distribute cocaine base, when, in fact, there was no factual basis to support such a plea.

Accordingly, Mr. Rodriguez will prove, below, that a "fundamental defect leading to a complete miscarriage of justice" occurred in this case when he was lead, by counsel, to believe that he had participated in a conspiracy to  commit  an aggravated drug trafficking offense, contrary to the real facts of this case. The real facts and legal contentions are more fully stated below:

## II. Statement of the Case

Sometime in approximately April of 2001, STEVEN REDMON, a civilian, contacted the Federal Bureau of Investigation (FBI) and offered to act as a Confidential Informant ("CI") in relation to drug trafficking, under certain conditions.  Mr. Redman wanted an incarcerated friend to receive credit for providing substantial assistance within the meaning of Rule 35(b) of the Federal Rules of Criminal Procedure based on Mr. Redman's efforts. Mr. Redman wanted to help his friend get out of prison sooner via a Motion for Sentence Reduction entered by the Government on behalf of Mr. Redman's incarcerated friend. The FBI apparently agreed to Mr. Redman's scheme, assigning Special Agent Frank L. DePodesta as lead investigator and "handler" of Mr. Redman (hereinafter "CI").

Sometime in late May of 2001, the CI came in contact with BRITANE NATHAN and eventually propositioned Miss Nathan by promising her a sum of money if she could connect him with someone who could sell him drugs. Miss Nathan related that she knew some-

(2)

one who could provide him with powder cocaine and marijuana. See, Affidavit of Special Agent Frank L. PoDesta, paragraph  8 , dated June 20, 2001, attached as Exhibit 1.  Miss Nathan then contacted her boyfriend, Frank Rodriguez.

At the time Frank Rodriguez became introduced to the Government's CI, he was working as a full-time employee at "Cook County Photo Copy" located in Chicago.  For additional income, he sold $10 bags of powder cocaine and small amounts of marijuana. See, FBI 302, attached as Exhibit 3.  Miss Nathan was aware of his illegal drug dealings, hence, her advise to the CI that she knew someone who could provide him with powder cocaine and marijuana. See, Affidavit of S/A DePodesta, paragraph  8 , at Exhibit 1.

Miss Nathan connected the CI and Mr. Rodriguez via telephone. Exhibit 1 at paragraph  8 .  In this initial contact, the CI expressed an interest in obtaining powder cocaine and marijuana but in quantities beyond the amounts which Mr. Rodriguez had available as far as concerned cocaine. Nevertheless, Mr. Rodriguez agreed to procure powder cocaine and marijuana for the CI. Mr. Rodriguez further agreed to provide the CI with a sample of both powder cocaine and marijuana. To procure the powder cocaine and sample, Mr. Rodriguez had to go to a long time friend who Mr. Rodriguez often referred to as his "counsin," PEDRO CASTILLO.

At the time Mr. Rodriguez contacted Pedro Castillo ("Castillo") Castillo was already involved with distributing large quantities and smaller quantities of both powder cocaine and crack cocaine

in conjunction with a man named ALFREDO BERRERA ("Berrera"). <u>See</u>,
e.g. FBI 302 at <u>Exhibit 3</u>.  Berrera provided Castillo with ounces
of cocaine with knowledge that Castillo would package the cocaine
in smaller quantities for street sells.  The Government's evidence
discloses that Berrera received the cocaine from his aunt without
payment and provided the drugs to Castillo without payment until
the cocaine was sold, in which case Castillo paid Berrera, minus
whatever profit Castillo made, and Berrera paid his aunt, minus
whatever profit Berrera made.  The aunt, Berrera, and Castillo
were involved in a full-fledged conspiracy to distribute cocaine.

The Government's evidence discloses no prior drug dealings
between Mr. Rodriguez and Castillo but makes a reference to their
close friendship. See Exhibit 3.  Mr. Rodriguez explained to Ca-
stillo that a guy (the CI) wanted to purchase some ounces of pow-
der cocaine and marijuana, and that he had promised to provide
the guy with a sample of both.  Mr. Rodriguez wanted to know whe-
ther Castillo wanted to deal with the guy and, if so, whether he
would provide the guy with a sample which Mr. Rodriguez would give
to the guy.  Castillo agreed to provide a sample and agreed to a
sell of cocaine at $1,000 per ounce.  There is nothing in the re-
cord to indicate that, at the time of the above meeting between
Mr. Rodriguez and Castillo, Mr. Rodriguez knew anything at all a-
bout Berrera or Berrera's aunt. See, Declaration of F.Rodriguez, <u>Exhibit 2.</u>

On June 4, 2001, Mr. Rodriguez provided a sample of powder
cocaine and marijuana to the CI. The samples were what the CI could

expect to purchase (as a presumed customer) in larger quantities if he were satisfied with the quality of the samples. See, Exhibit 1, paragraph 10.

On June 6, 2001, the FBI recorded a conversation between Mr. Rodriguez and the CI who then sought to purchase three ounces of cocaine. It was during this conversation that Mr. Rodriguez promised to introduce the CI to his "counsin" (Pedro Castillo).

According to the FBI's version of events, the CI expressedly spoke to to Mr. Rodriguez, on June 6, 2001, about purchasing three ounces of crack cocaine. However, in a sworn declaration entered herein as Exhibit 2, Mr. Rodriguez disputes the sworn affidavit of S/A DePodesta that the word "crack" was ever mentioned or that it was Mr. Rodriguez's understanding on June 6, 2001 that the CI wanted crack rather than the powder cocaine originally requested.

What is clear and undisputable from the record is that, if on June 6, 2001, the CI sought to obtain crack rather than powder cocaine, then the shift from powder cocaine to crack cocaine was initiated exclusively by specific instructions from the FBI to the CI or originated from the CI acting for the FBI but did not originate with Mr. Rodriguez acting either for the CI or for Castillo, and the shift from powder cocaine to crack did not originate with Castillo. See, Exhibit 1 at paragraph 13; and see, Declaration of Frank Rodriguez at paragraph 2.

On the morning of June 7, 2001, at approximately 11:30 a.m., the FBI recorded a telephone call to Mr. Rodriguez from the CI who

wanted to know the status of their proposed drug deal. Mr. Rodri-
guez advised that he would call his "counsin" to check on things.
After telephoning Castillo, Mr. Rodriguez called the CI and advised
that everything was ready and that he would meet the CI at a Ken-
tucky Fried Chicken restaurant.

Again, the FBI version of events claims that, in the record-
ed telephone call on June 7, 2001, Mr. Rodriguez informed that the
three ounces of <u>crack</u> were available. Mr. Rodriguez denies that
the word "crack" was ever used and denies that he understood Ca-
stillo to mean that Castillo had the crack, rather the powder, co-
caine ready to complete the drug deal.

At approximately 1:30 p.m. on June 7, 2001, Mr. Rodriguez
called the CI and instructed him to call Castillo at a specified
telephone number ((773) 609-5439)). The CI did so, and Castillo
instructed him to pick up Mr. Rodriguez who would direct the CI
to the place where Castillo was located. Castillo also advised
that the cocaine would cost "three stacks" meaning three thousand
dollars. These telephone calls were recorded by the FBI.

At approximately 5:00 p.m. on June 7, 2001, the CI met with
Mr. Rodriguez at the Kentucky Fried Chicken restaurant. According
to S/A DePodesta, the CI was "equipped with a concealed recording
device ..." <u>See</u>, Exhibit 1 at paragraph 20.

Mr. Rodriguez directed the CI in driving to a residence lo-
cated at 3328 West 65th Place in Chicago. As soon as the CI parked

inside a garage and exited the vehicle, Castillo searched the
CI but did not discover the hidden transmitter hidden on the CI's
person.

After the search, Castillo proceeded to a workbench in the
garage and retrieved a see-through plastic baggie containing powder
cocaine. Castillo allowed the CI to hold the baggie and sniff the
cocaine fumes inside of the baggie. Castillo explained to the CI
that the smell of the cocaine should indicate that it was the same
quality as the sample provided to the CI. Castillo then retrieved
a weigh-scale and placed the baggie of cocaine on it. He adjusted
the weights to indicate 84 grams and let the CI verify the weight.
At this time the CI began to protest that he wanted crack instead
of powder cocaine and had expected the cocaine to have been ready
in that form upon his arrival. The CI asked Castillo if he could
process the powder into crack and how much extra it would cost to
turn the powder into crack.

Castillo agreed to process the powder cocaine into crack. In
the meantime, prior to the "cooking" of the cocaine, Mr. Rodriguez
left the residence to go to the store to purchase beer. Castillo
and the CI were on hand during the conversion to crack cocaine
and Mr. Rodriguez returned before the process ended. The CI paid
Castillo $3,000.00 for what had been turned to crack cocaine. None
of this payment went to Mr. Rodriguez.

According to S/A DePodesta, Mr. Rodriguez and the CI left
Castillo's residence at approximately 8:12 p.m.  The CI drove Mr.

(7)

Rodriguez back to his car and the two men parted.

According to the Government, later that evening at approximately 10:45 p.m., Rodriguez telephoned the CI and asked for some money for bringing the CI together with Castillo, but the CI refused to pay any money to Mr. Rodriguez. See, FBI 302, SOURCE.

According to the Government, on June 18 2001, the CI placed a call and left a message for Mr. Rodriguez to call but he did not call back. The CI then placed a FBI recorded call to Castillo in which the CI requested a purchase of 7 or 8 ounces of crack. This was a purchase of crack from start to finish, unlike the previous purchase on June 7, 2001. See, Exhibit 1 at paragraph 39.

On June 20, 2001, Castillo and Berrara met with the CI to distribute what turned out to be 162.3 grams of crack cocaine. See Exhibit 1 at paragraph 39.  The CI led them to a place where the FBI could effect their arrest and recover the crack cocaine.

Mr. Rodriguez was arrested on June 27, 2001.  When arrested, he was found carrying two baggies containing powder cocaine and some pills.  A search of his home lead to recovery of 67 grams of marijuana.

### III. Procedural History & Facts

1.    On October 25, 2001, a Six-Count Indictment was filed in the Northern District of Illinois naming Frank Rodriguez in Counts 1 and 2 with: Conspiracy to Possess with the Intent to Distribute in Excess of 50 Grams of Cocaine Base (also known as crack); Count Two charged that on June 7, 2001, Mr. Rodriguez,

with Castillo and Berrera, Distributed in Excess of 50 Grams of
Cocaine Base. (R.10)

2.   Movant was arraigned on November 1, 2001, and on Novem-
ber 8, 2001, Attorney Piyush Chandra was appointed as defense coun-
sel. (R.16 & 21)   Attorney Chandra was subsequently disqualified
from representing Movant based on his own advise to the Court that
he was not a member of the trial bar. (R.24).   Attorney James A.
Graham  filed an appearance on December 13, 2001, (R.28), as ap-
pointed by the Court.   However, on February 9, 2002, Attorney Raul
Villalobos filed an appearance as counsel for Mr. Rodriguez, (R.40)
and in response to a motion by Mr. Rodriguez to withdraw appointed
counsel James A. Graham. (R.32)

3.   On February 19, 2002, the United States filed an emergen-
cy motion to revoke bond (R.37) that had been granted Mr. Rodriguez
on 11/13/2001 (R.19), and the motion to revoke bond was granted on
February 20, 2002 (R.39).

4.   On May 2, 2002, a Rule 11 Plea Agreement was signed by
the parties (R.68) and on the same date Movant withdrew his former
plea of not guilty and entered a plea of guilty to Count 1. (R.69)

5.   On May 5, 2002 a _Santiago_ proffer was made by the United
States (R.70).   Then, on May 22, 2002, Movant filed a motion to
dismiss and discharge Attorney Raul Villalobos, (R.84), but this
motion was denied by the Court. (R.92)

6.   On August 20, 2002, Movant entered a Motion to Withdraw
Guilty Plea (R.100), and Attorney **Ray L.** Prusak filed an appearance
as counsel for Movant. (R.103)(entered on 8/22/02).

(9)

7.    On September 11, 2002, Movant filed a Motion to Amend his motion to withdraw guilty plea (R.110) and (R.126)

8.    On November 19, 2002, Movant filed a Motion to Withdraw Charge of Conspiracy to Count 1. (R.130)  On December 5, 2002, the Court denied Movant's motions and Amended motion to withdraw his guilty plea (Dkt Nos. 100,101, 110, 126, 130). See, (R.153)

9.    On December 09, 2002, Movant filed his objections to the Pre-sentence Report (PSR). (R.134)

10.    On December 17, 2002, Movant appeared for sentencing before Hon. James F. Holderman, who imposed a 180-month term of imprisonment, five years supervised release, a fine of $500.00, and $3,000.00 in restitution. (R.139)  A timely Notice of Appeal was filed on 12/19/2002 (R.137)

11.    On May 3, 2005, the Court of Appeals for the Seventh Circuit issued a limited remand order for resentencing of Movant.

12.    On November 11, 2005, the District Court informed the Court of Appeals that it would not have sentenced Movant any differently had the Court known the Sentencing Guidelines were not binding. (R.170)

13.    On November 17, 2006, the Court of Appeals affirmed the decision of the District Court in Appeal Nos. 02-3584 and 02-4344. (R.180).

14.    This motion under 28 U.S.C. Section 2255 is timely filed.

(10)

## IV. Applicable Standards/Section 2255 Motion

Section 2255 allows a person convicted of a federal crime to vacate, set aside, or correct his sentence. This relief is available where there is an error that is jurisdictional, of Constitutional magnitude, or equates to a "complete miscarriage of justice." See, e.g., Harris v. United States, 366 F.3d 593, 594 (7th Cir.2004). 28 U.S.C. Section 2255 provides that:

> A prisoner in custody under sentence of a court establish-
> ed by Act of Congress claiming the right to be released
> upon the ground that the sentence was imposed in violation
> of the Constitution or laws of the United States, or that
> the court was without jurisdiction to impose such sentence,
> or that the sentence was in excess of the maximum authorized
> by law, or is otherwise subject to collateral attack, may
> move the court which imposed the sentence to vacate, set a-
> side, or correct the sentence.

28 U.S.C. Section 2255, paragraph 1.

If the court determines that any of these grounds exists, it "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. Section 2255, para-graph 2. "Unless the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing (evidentiary hearing). Id.

"A district judge need not grant an evidentiary hearing in all Section 2255 cases. Such hearing is not required if 'the record standing alone conclusively demonstrates that a petitioner is entitled to no relief." Daniels v. United States, 54 F.3d 290 (7th Cir.1995), quoting Humphrey v. United States, 896 F.2d 1066, 1070 (7th Cir.1990), cert. denied, 498 U.S. 938, 111 S.Ct. 342,

112 L.Ed 2d 306 (1990). "A district court, however, must grant an evidentiary hearing if the petitioner 'alleges facts that, if proven, would entitle him to relief.'" Stoia v. United States, 22 F.3d 766,768 (1994).

Lastly, the movant in a Section 2255 proceeding bears the burden of establishing his contentions. Holmes v. United States, 323 F.2d at 431 (7th Cir.1963) Accordingly, he must prove his claims by a preponderance of the evidence. Hearn v. United States, (1952 CA7 Ind) 194 F.2d 647, cert denied (1952) 343 U.S. 968, 96 L.Ed 1364, 72 S.Ct. 1064.

## GROUND ONE

I.  WHETHER MOVANT'S PLEA OF GUILTY WAS UNKNOWING AND INVOLUNTARY, WHERE COUNSEL RENDERED DEFECTIVE LEGAL ADVISE REGARDING CHARGES IN COUNTS ONE AND TWO OF THE INDICTMENT?

A.  Standard of Review

Claims of ineffective assistance of counsel involve a mixed question of fact and law that is reviewed de novo. Strickland v. Washington, 466 U.S. 668 (1984).

In Strickland, the Supreme Court also established a "two-prong" test for evaluating claims of ineffective assistance of counsel. To merit relief, a defendant must prove (1) that counsel's performance was objectively unreasonable under prevailing professional norms; and, (2) that he was prejudiced by counsel's deficient performance. Strickland, 466 U.S. 687-689.

In the context of a guilty plea, a defendant must prove the first prong of Strickalnd, above, and establish prejudice by show-

ing that, but for counsel's errors, there is a reasonable proba-
bility that defendant would not have pleaded guilty and, instead,
would have insisted on going to trial. Hill v. Lockhart, 474 U.S.
52,59 (1985).

Because a defendant waives many constitutional rights by
pleading guilty, the plea must be entered knowingly and voluntari-
ly, Parke v. Raley, 113 S.Ct. 517,523 (1992), with the advice of
competent counsel. Tollet v. Henderson, 411 U.S. 258,263 (1973).

B.    Argument

The Sixth Amendment to the Constitution provides that "(I)n
all criminal prosecutions, the accused shall enjoy the right ...
to have the Assistance of Counsel for his defense." Const. amend
VI.    The Supreme Court has held that the Sixth Amendment right to
counsel is the right to "the effective assistance of counsel." See
McMann v. Richardson, 397 U.S. 759 n.1 (1970).

In the present case, Movant was represented by several attor-
neys during pre-trial proceedings; however, the attorney who han-
dled Movant's plea negotiations, plea agreement, and change of plea
was Attorney Raul Villalobos, and it is Attorney Villalobos whose
representation is in question in this case. Mr. Villalobos was re-
tained by the defendant in this case. The law makes no distinction
between retained and appointed counsel for purposes of the Sixth
Amendment guaranty. See, Cuyler v. Sullivan, 446 U.S. 335, 64 L.Ed
2d 333, 100 S.Ct. 1708 (1980).

The substance of Movant's allegations against Mr. Villalobos'

(13)

representation is that he failed to properly investigate this case or make a good-faith effort to learn all of the facts necessary to giving Movant objectively reasonable legal advise concerning the crack-cocaine charges Movant faced.

For example, it is a fact that Movant dealt only in very small quantities of <u>cocaine powder</u> both prior to and after his introduction to the Government's CI.[1]/ Counsel knew this fact. During the initial contact between Movant and the CI, only <u>powder cocaine</u> and marijuana were discussed. Counsel knew this fact based on discovery materials disclosed by the Government.

In terms of the facts necessary to support a charge of conspiracy to distribute crack cocaine, counsel knew, based on interviews with Movant and based on discovery materials, that Movant had gone to a long time friend, Castillo, to discuss the potential sell of ounce quantities of <u>powder cocaine</u> to a (then) potential buyer (the CI). Counsel knew Movant discussed with Castillo <u>only powder cocaine</u>. It was for this reason that Castillo provided Movant with a sample of <u>powder cocaine</u> to give to the potential customer with whom Movant was in contact.

On June 4, 2001, Movant distributed to the CI the sample of <u>powder cocaine</u> given to him by Castillo. This cocaine was turned over to the FBI who caused it to be chemically analyzed. Counsel knew the drug analysis conclusively showed the controlled substance Movant distributed to the CI on June 4, 2001 was,

---

[1]/ When Movant was arrested on June 17, 2001, well after his involvement in the instant offense had ended, he was found in possession of a small quantity of powder cocaine.

(14)

in fact, powder cocaine. See, Drug Analysis Report at Exhibit <u>5</u>.

A criminal conspiracy is defined as "an agreement to commit a crime." <u>United States v. Lechuga</u>, 994 F.2d 346 (7th Cir.1993), quoting <u>Ianelli v. United States</u>, 420 U.S. 770,777, 96 S.Ct. 1284, 1289, 43 L.Ed 2d 616 (1975); <u>United States v. Blankenship</u>, 970 F.2d 283,285 (7th Cir.1992). However, in <u>Lechuga</u>, supra, the Seventh Circuit explained further concerning a drug conspiracy. The Court said:

>  "A conspiracy is not merely an agreement. It is an agreement with a particular kind of object---an agreement to commit a crime. When the sale of some commodity, such as illegal drugs, is the substantive crime, the sale agreement itself cannot be the conspiracy, for it has no separate criminal object. What is required for conspiracy in such a case is an agreement to commit some other crime beyond the crime constituted by the agreement itself...."

<u>Lechuga</u>, 944 F.2d at 349.

<u>Lechuga</u> involved a government undercover agent who, in that case was a man named Carr. He arranged to buy 500 grams of cocaine from another man named Pinto. Id. at 346. To obtain the cocaine, Pinto contacted another man named Pagan "who had previously sold Pinto cocaine that Pagan had obtained from Lechuga." Id.

Pagan relayed Pinto's order to Lechuga, who then arranged a place for Pagan to receive the cocaine from Lechuga to give to Pinto. Pagan with Pinto and Carr went to the designated place and Pagan went in and emerged carrying two packages. One contained 500 grams, Pinto's order. The other contained 3 ounces of cocaine. The second package was intended to make-up for a previous sell to Pinto in which the amount had been 3 ounces short. However, as soon as Pagan gave the drugs to Pinto, the two were ar-

rested.  Lechuga was arrested later. Id. at 347.

Under the above facts in <u>Lechuga</u>, the Seventh Circuit held
that there was no conspiracy between Lechuga and Pinto "in so
far as there was an agreement ... merely on the one side to sell
and on the other to buy, there was no conspiracy between them no
matter what Pinto intended to do with the drugs after he bought
them. Lechuga would not, merely by selling to Pinto, have been
agreeing to some further sale. A person who sells a gun knowing
that the buyer intends to murder someone may or may not be an
aider or abettor of the murder, but he is not a conspirator, be-
cause he and his buyer do not have an agreement to murder anyone."
<u>Lechuga</u>, 994 F.2d at 349.  However, the Court held that the agree-
ment between Lechuga and Pagan constituted a bona fide conspiracy.
The Court explained that:

> "The critical issue is whether, on the one hand, the
> relationship between Lechuga and Pagan is properly charac-
> terized as that of a spot seller and a spot buyer; or, on
> the other hand, whether the sale was from Lechuga to Pinto
> with Pagan functioning as a go-between, facilitator, sales
> agent and general helper. If, knowing that Lechuga was a
> drug dealer, Pagan assisted him in distributing drugs to
> at least one dealer farther down the chain of distribution,
> namely Pinto, then Lechuga and Pagan were co-conspirators.
> <u>United States v. Aguilar</u>, 948 F.2d 392,396 (7th Cir.1991);
> <u>United States v. Boyer</u>, 931 F.2d 1201 (7th Cir.991); <u>Uni-
> ted States v. Rivera</u>, 855 F.2d 420 (7th Cir.1988).

<u>Lechuga</u>, 994 F.2d at 350.

In the instant case, counsel was obligated to determine
whether the facts involving the distribution of the powder cocaine
sample to the CI on June 4, 2001, constituted a conspiracy be-

(16)

tween Castillo and Movant and, secondly, whether the June 4, 2001
distribution could be used to charge and/or convict Movant of the
charges in Counts 1 and 2 of the indictment.

To prove conspiracy, the government must prove an agreement
to commit a crime separate from the mere purchase or sale of the
drug. Lechuga, Id. at 347. However, that agreement can be an im-
plicit understanding between the parties regarding the subsequent
resale of drugs. United States v. Clay, 37 F.3d 338,341 (7th Cir.
1994), although a sale agreement cannot constitute a conspiracy
when the sale itself is the conspiracy's substantive crime. United
States v. Garcia, 89 F.3d 362,365 (7th Cir.) cert. denied ___U.S.
___, 117 S.Ct. 443, 136 L.Ed 2d 340 (1996). See also, United States
v. Baskin-Bey, 45 F.3d 200 (7th Cir.1995)(holding that Lechuga is
inapplicable when the alleged co-conspirators are on the same side
of the transaction, that is, there can be no "buyer/seller" re-
lationship when conspirators are on the same side).

In the present case, Castillo and Movant were on the same
side of the distribution relative to the buyer. Movant also did
act as a "go between, facilitator, sales agent, and general help-
er" of Castillo in the June 4, 2001 distribution of powder cocaine
to the CI. However, the Lechuga legal holdings break-down at this
point as applied to the facts of this case, because the CI did not
pose, and cannot be said to have been, a "drug dealer farther down
the chain of distribution," Lechuga, 995 F.2d at 350, in the same
sense that Lechuga and Pagan agreed to sell drugs to Pinto who in

turn intended to distribute the drugs to the CI in the <u>Lechuga</u> case.

Thus, under the facts and the law applicable at the time of the instant offense, it must be presumed by this Court that counsel knew, or should have known, that the charges involving crack cocaine in Counts 1 and 2 of the indictment could not be supported based on the facts of this case beginning sometime in late May of 2001 and up to, and including, June 4, 2001. At most, the facts surrounding the distribution of the powder cocaine sample to the CI on June 4, 2001, would support a conviction on conspiracy to distribute a detectable amount of powder cocaine, whereas the indictment charged offenses involving only crack-cocaine. Therefore, counsel's advise to plead guilty could not be deemed competent legal advise on the basis of the above related facts.

In order for the Government to have a factual basis to support a guilty plea to any offense charging crack cocaine which occurred after June 4, 2001, the Government would have to bring forth evidence that "a drug conspiracy existed and that defendant knowingly and intentionally joined in the criminal purpose and agreed with others to commit a crime." <u>United States v. Garcia</u>, 45 F.3d 196 (7th Cir.1995), citing <u>United States v. Cabello</u>, 16 F.3d 179 (7th Cir. 1994); <u>Lechuga</u>, supra, (en banc).

A reasonable investigation by counsel would have disclosed that, after the June 4, 2001 distribution, Movant <u>did</u> <u>not</u> enter into any "new" agreement to commit a crime other than the original

(18)

agreement he had made with the CI to procure powder cocaine for
the CI from a source known to Movant, and the agreement Movant had
with Castillo to simply stay in contact with the buyer and to in-
form Castillo if or when the buyer wanted to make a purchase of
powder cocaine.

Discovery materials disclose that, on June 6, 2001, the CI
telephoned Movant. This call was both monitored and recorded by
the FBI. Notwithstanding S/A DePodesta's mischaracterization of
the conversation between the CI and Movant as being a discussion
about "crack," counsel could have, and should have, obtained a
copy of the recorded conversation in order to ascertain that, in
fact, crack was never mentioned during the conversation on June
6, 2001.  An investigation of such a recorded conversation would
be incumbent upon a competent criminal defense attorney.

On June 7, 2001, the CI telephoned Movant during the morning
hours. This telephone call was monitored and recorded by the FBI.
Neither the CI nor Movant mentioned crack-cocaine. Then, at about
11:30 a.m., S/A DePosdesta relates in his affidavit that the CI
again telephoned Movant on behalf of the FBI, this time "to check
on the status of their transaction." According to S/A DePodesta,
Movant advised that he would call his cousin (Castillo) then call
back to the CI, which Movant did. S/A DePodesta claims Movant told
the CI that the cocaine "was being cooked right now ...," but such
a statement is easily refuted, as shown by subsequent facts.

Counsel may or may not have had access to S/A DePodesta's

(19)

affidavit; however, enough FBI recorded material was available to counsel under Brady v. Maryland, 373 U.S. 83 (1963) for counsel to reach the conclusion that any charge for crack cocaine, or any conspiracy involving crack, would have to be supported by evidence obtained after June 4, 2001.  The continuing record discloses no such agreement, implicit or otherwise, between Castillo and Movant.

At approximately 1:30 p.m. on June 7, 2001, Movant telephoned the CI and gave him a telephone number with which to reach Castillo. This would be the first time the CI and Castillo talked directly to eachother.  Movant was not party to the conversation which was recorded by the FBI. S/A DePodesta relates that Castillo instructed the CI to pick-up Movant and that Movant would direct the CI to Castillo's residence.

The CI and Movant met at approximately 5:00 p.m. on June 7, 2001 and proceeded to Castillo's residence located at 3328 West 65th Place in Chicago.  The CI wore a hidden transmitter from which the FBI could record parts of conversations taking place in close proximity to the CI.  The CI parked into a garage area, they exited the vehicle, and the CI was searched by Castillo.

After the search, Castillo proceeded to a workbench inside of the garage and retrieved a plastic see-through baggie containing powder cocaine. Castillo allowed the CI to hold the baggie and sniff the cocaine fumes inside to insure that it was the same quality of cocaine that had been provided to the CI as a sample on

(20)

June 4, 2001. Castillo then retrieved a weight-scale and weighed
the powder cocaine. He adjusted the weights to indicate 84 grams
and then allowed the CI to verify the weight of the powder cocaine
by sight. These facts conclusively prove S/A DePodesta was wrong
when he suggested that Movant had told the CI the cocaine "was be-
ing cooked right now," when the CI had telephoned Movant earlier
on that day on June 7, 2001. Obviously, no cocaine was being cooked.

Based on the FBI's recorded conversation taking place of
the CI, Castillo, and Movant during the drug transaction, it was
only after the CI had acknowledged the type and weight of the drug
agreed on that the CI voiced a desire to have the cocaine conver-
ted to crack and asked Castillo how much he would charge to con-
vert the powder cocaine to crack. This was a separate deal and a
separate crime under the law. Movant had not agreed to any distri-
bution involving crack cocaine. Neither was a crack deal "reasona-
bly foreseeable" under the circumstances. Movant made it a point
not to ever involve himself in a sell of crack, and he did not
involve himself in aiding or assisting Castillo or the CI in the
preparation of converting the powder cocaine to crack.

The facts clearly demonstrate that Movant's agreement from
the beginning to the end in this case involved powder cocaine. In
the end, after the powder cocaine had been presented to the CI,
the CI specifically asked Castillo, not Castillo and Movant, about
converting the powder to crack. It should also be noted that it
was the Government who had made the request for its own purposes.

A later drug transaction occurred between the CI and Castillo
and his partner, Bererra, in which seven (7) ounces of crack co-

(21)

caine were distributed to the CI preparatory to the immediate ar-
rest of Castillo and Berrera. Movant was not charged for that drug deal.

    1.    Ineffective Assistance of Counsel/Guilty Plea/Seventh
        Circuit Case Law Authority.

    In Moore v. Bryant, 348 F.3d 238,241 (7th Cir.2003), the
Court held that "In order to demonstrate ineffective assistance
in the context of a guilty plea, (Movant) must demonstrate that
his counsel's advise regarding the plea was objectively unreason-
able and that there is a reasonable probability that, but for
counsel's error, (Movant) would not have pled guilty, but would
have insisted upon a trial. Hill v. Lockhart, 474 U.S. 52,59, 106
S.Ct. 366, 88 L.Ed 2d 203 (1985); Strickland v. Washington, 466
U.S. 668, 104 S.Ct. 2052, 80 L.Ed 2d 674 (1984)."

    The Seventh Circuit further explained that,

>     "We have identified the criteria that apply regard-
> ing an attorney's advice concerning an offer of a plea
> agreement. A reasonably competent counsel will attempt
> to learn all of the facts of the case, make an estimate
> of a likely sentence, and communicate the results of
> that analysis before allowing his client to plead guil-
> ty. United States v. Barnes, 83 F.3d 934,939 (7th Cir.
> 1996)."

>     "Although the attorney's analysis need not provide
> a precisely accurate prediction of the respective conse-
> quences of pleading guilty or going to trial, the scru-
> tiny must be undertaken in good faith." Id. at 939-40.
> When an attorney fails to do so and that failure is the
> decisive factor in the decision to plead guilty, the
> Sixth Amendment is violated and the defendant may with-
> draw his plea. Id. at 940."

Moore, 348 F.3d at 241.

    In Moore, the fifteen year-old defendant was charged with

first degree murder and as an adult. The evidence indicated that the defendant had not been present at the shooting of the victim and was not the shooter, however, the State of Illinois' theory of criminal liability was based upon the defendant's involvement as one of a group of individuals who had chased the victim. Id. at 240.

In May 1995, just before trial commenced, the defendant pled guilty in exchange for the state's recommendation that he receive the minimum 20-year sentence.

> "Shortly thereafter, however, Moore sought to withdraw the plea. In his amended motion to withdraw the guilty plea, Moore alleged that the plea was not knowing and voluntary for a number of reasons, including the erroneous advice given to him by his attorney. He alleged that his attorney had informed him that the law in Illinois was changing and that good-time credits to which he currently would be entitled were being limited. As a result of that change in Illinois law, his attorney told him that, if convicted, he would serve 85% of the sentence imposed, whereas if he pled guilty immediately, he would serve, under current Illinois only 50% of a 20-year sentence. The attorney informed him that his sentence if convicted would be between 25 and 30 years ... That advice was erroneous ..."

Moore, Id. at 240.

In the present case, counsel advised Movant that the facts of this case supported a conviction involving the distribution of more than 50 grams of cocaine base "crack," and a conspiracy to do same. The penalty Movant was advised he faced in the penalty outlined in the plea agreement for a violation of Title 21 U.S.C. Sections 841(a)(1), 841(b)(1)(A) and 846, a minimum of ten years and a maximum of Life. The application of the Sentencing Guidelines were not precisely discussed to the extent of any

particular range of sentences.  Like <u>Moore</u>, Movant agreed to
enter a plea of guilty which Movant signed on May 2, 2002, and
formally accomplished in court on the same date. Then, on May
22, 2002, Movant filed a motion to dismiss and discharge Attor-
ney Raul Villalobos, but this motion was denied. On August 20,
Movant sought to withdraw his plea when new counsel filed an
appearnace on Movant's behalf. <u>See</u>, R.68, R.69, R.84 and R.92.

Movant's plea of guilty was not knowing, intelligent, or
voluntary, <u>Parke v. Raley</u>, 113 S.Ct. at 523, with the advice of
competent counsel.  <u>Tollet v. Henderson</u>, 411 U.S. at 263.

First, Movant did not know his crime centered on the "crimi-
nal agreement" he entered into with the CI and then with Castillo
to act as a go-between in the distribution of a quantity of <u>powder</u>
<u>cocaine</u>.  The amount of powder cocaine the CI informed Movant he
wished to purchase was three (3) ounces. This involved a viola-
tion of a <u>particular</u> drug trafficking offense distinct and dif-
ferent from the drug offense which counsel advised Movant was
supported by the facts of this case.

Title 21 U.S.C. Section 841(a)(1) prohibit, among other things,
possession of controlled substances with the intent to distribute
them. <u>See</u>, 21 U.S.C.A. Section 841(a)(1). Subsection 841(b) sets
forth penalties that vary according to, e.g., the quantity of the
particular controlled substance at issue. <u>See</u> 21 U.S.C.A. Section
841(b).  A defendant who is held to possess with intent to distri-
a detectable but unidentified amount of a schedule I or II control-

(24)

led substances is subject to a term of imprisonment of zero to
20 years. See 21 U.S.C.A. Section 841(b)(1)(C). In the case of
cocaine, if a defendant is held to possess a threshold amount of
at least five (5) grams of cocaine base or 500 grams of cocaine
powder, he is subject to a <u>mandatory</u> <u>minimum</u> of 5 years and a
maximum of 40 years. Lastly, if a defendant is held to possess
a threshold amount of 50 grams of cocaine base or 5 kilograms of
cocaine powder, then he is subject to a <u>mandatory</u> <u>minimum</u> of 10
years and a maximum sentence of life. 21 U.S.C. Section 841(b)(1)(A).

Thus, 841(b) "defines three separate offenses by the specifi-
cation of distinct elements, rather than defining a single crime
with a choice of three maximum penalties ..." <u>See, e.g.</u>, <u>Jones</u>
<u>v. United States</u>, 526 U.S. 227,229, 143 L.Ed 2d 311, 119 S.Ct.
1215 (1999), interpreting 18 U.S.C. Section 2119 which is similar-
ly constructed as the drug statute under 21 U.S.C. Section 841(b).

Based on the facts and the applicable law to the facts of
this case, counsel advised Movant to enter a plea of guilty to
an aggravated drug offense embodied in a conspiracy charge that
Movant had never committed and for which there was no factual ba-
sis upon which a guilty plea could rest outside of a false admis-
sion or stipulation to a false charge.

Counsel gave Movant "objectively unreasonable advice" to
plea guilty to an aggravated crime that carried a more serious
penalty than the crime Movant most likely did commit, that is, a
conspiracy to distribute 84 grams of powder cocaine.  Counsel's

deficient advise was a direct result of one of two things; (1) counsel failed to "attempt to learn all of the facts of the case," United States v. Barnes, 83 F.3d at 939 (7th Cir.1996); or (2) counsel failed to apply the law to the facts. Thus, defense counsel's performance was deficient where his faulty analysis of the applicable law to the facts lead counsel to advise Movant to enter a plea of guilty to a charge for which counsel should have advised Movant to go trial. Moore, 348 F.3d at 241 (7th Cir.2003).

Movant was prejudiced by counsel's deficient advise to enter a plea of guilty to a crack cocaine conspiracy because, but for counsel's deficient advise, Movant would have insisted on going to trial. Hill v. Lockhart, 474 U.S. at 59. This is so because the Government lacked evidence to prove beyond a reasonable doubt that Movant had conspired with Castillo to commit a cocaine distribution involving crack-cocaine. Competent counsel would have realized that a conspiracy to distribute crack cocaine is a distinct and separate crime from a conspiracy to distribute powder cocaine, not to mention the difference in penalties between the two crimes.

It follows that Movant's plea of guilty to a conspiracy to possess with intent to distribute crack cocaine was not knowing, intelligent, or voluntary because not entered into with the advice of competent counsel and Movant simply was not knowledgeable enough about the law to understand that the facts did not support the charge counsel advised Movant to plead guilty to committing.

Accordingly, this Court should analyze Movant's counsel claim

by the standard demanded under the Sixth Amendment to the Constitution as interpreted by the Supreme Court in Strickland v. Washington: "(T)he purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." 466 U.S. at 691-692. The "outcome" of the Change of Plea hearing is that Movant unknowingly and involuntarily entered a plea of guilty to a crime he did not know he did not commit, for no other reason than that he did not have competent legal advice.

Based on all of the above stated facts and applicable law, Movant respectfully request this Court to vacate his conviction and sentence and remand this case for further proceedings; alternatively, Movant request this Court to grant an evidentiary hearing and appoint counsel because the files and records of this case cannot and do not "conclusively show" that Movant is entitled to no relief on his claim that his Sixth Amendment right to counsel was violated in this case. Daniels v. United States, 54 F.3d 290 (7th Cir.1995). The Seventh Circuit mandates an evidentiary hearing "if the petitioner 'alleges facts that, if proven, would entitle him to relief.'" Stoia v. United States, 72 F.3d 766,768 (7th Cir.1994). Movant has shown the his counsel failed to seek to learn all of the pertinent facts of this case; his counsel's analysis of the applicable law to the facts was defective; his counsel's advice to plead guilty to a crack-cocaine conspiracy was deficient advice; and that, but for counsel's errors, Movant

(27)

would not have pleaded guilty and, instead, would have insisted on going to trial. <u>Hill v. Lockhart</u>, 474 U.S. 52,59 (1985). Accordingly, an evidentiary hearing should be ordered if other relief is not granted.

### GROUND TWO

II.  WHETHER THE DISTRICT COURT ERRED BY ENHANCING MOVANT'S SENTENCE FOR OBSTRUCTION OF JUSTICE, WHERE ALLEGATION OF THREAT TO WITNESS FAILED TO SHOW THAT ANY SUCH A THREAT WAS INTENDED TO "OBSTRUCT" RATHER THAN ENSURE THE WITNESS WOULD APPEAR IN COURT TO TESTIFY?

A.   <u>Argument</u>

In <u>United States v. Messino</u>, the Seventh Circuit held that "(A)n enhancement under Section 3C1.1 (Obstruction or Impeding the Administration of Justice) may be imposed only if the court finds that the defendant willfully obstructed or impeded the investigation, prosecution, or sentencing by way of conduct related to the defendant's offense or a closely related offense." 382 F.3d 704,708 (7th Cir.2004), quoting <u>United States v. King</u>, 338 F.3d 794,799 (7th Cir. 2003).

In the instant case, Movant's sentence was enhanced by two base offense levels for "obstructing justice" by allegedly writing a threatening letter to his former girlfriend, Britane Nathan. According to the PSR, Movant was in the Stephenson County Jail when he wrote in a letter mailed on April 10, 2002 the following words after asking Miss Nathan to contact him by a certain date:

"i will call my 3 brothers and my 6 cousins from their it will get very ugly once they find out im going to prison i cant control unless (Nathan) helps me. believe

me its no joke these guy dont play and theirs nothing you
or the FBI, or cops, or even god can do about it."

See, PSR at 156-159.

The Probation Officer quoted only a small part of the letter
so that the quoted portion could not be understood in the context
in which it had been written.

Movant's motivation for writing the so-called "threatening"
letter stemmed from the fact that the CI in this case, STEVEN RED-
MON, had, in fact, threatened Britane Nathan and obstructed jus-
tice by warning Miss Nathan that if she appeared in Court on Mo-
vant's behalf for any reason, then he (Steven Redmon), would see
to it that Miss Nathan was indicted for her part in the instant
offense. Apparently, Steven Redmon did not want it to be known
that Movant's true role in the instant offense concerned an agree-
ment to distribute only cocaine powder.  Mr. Redmon feared that if
Miss Nathan appeared in court, she would be able to shed some light
on Movant's culpability and expose the fact that the CI had mis-
led federal investigators as regards Movant's true role, especial-
ly where the CI had to fill-in-the blanks of recorded conversa-
tions that had only been recorded in bits and pieces.  The CI did
not want Movant to receive the much shorter sentence for powder
cocaine because the CI thought it in his own best interest that
Movant be exposed to a much longer, rather than shorter, sentence.

Movant was urging Miss Nathan to appear in court and to tes-
tify truthfully, because, as of April 10, 2002, Movant anticipated
going to trial.  He had not yet entered a plea of guilty in this

(29)

case.   See, Declaration of Frank Rodriguez at <u>Exhibit 2</u>.

Notwithstanding all of the above, an enhancement under Section 3C1.1 requires "the defendant willfully obstructed or impeded the <u>investigation</u>, <u>prosecution</u>, or <u>sentencing</u> by way of conduct related to the defendant's offense or a closely related offense," <u>King</u>, 338 F.3d at 799. (emphasis added)

In the instant case, the Probation Office or prosecutor failed to positively demonstrate that the writing of the letter in question "impeded" either the investigation, prosecution, or sentencing in this case.  That Movant's letter may have had an impact or potentially had an impact falls short of what is required under USSG 3C1.1, where the facts of this case disclose that Movant appeared in court and entered a plea of guilty on May 2, 2002.

Only three weeks had elapsed in between the time that Movant wrote the letter and the date he pleaded guilty. THE LETTER NEVER REACHED Miss. Nathan. Not a single federal investigator offered <u>any</u> statement claiming the letter had affected the investigation in any manner whatsoever.  The prosecution has not asserted that the letter "impeded" the prosecution or sentencing.  Only the Probation Officer, standing alone, instigated the enhancement while failing to offer even a scintilla of eveidence that the letter impeded either the investigation, prosecution, or sentencing in this case.

Even if the letter had reached Miss. Nathan, the probation officer would have been hard pressed to show a violation of 3C1.1

in a case where (1) the factual basis to support a conspiracy
charge was well established, at least as regards powder cocaine
so that the letter had no impact on the investigation of this
case; (2) Miss Nathan was no longer required as a potential wit-
ness once Movant entered a plea of guilty; (3) the Government
had no intention or need to call Miss. Nathan to testify at the
sentencing hearing since she would only have supported the fact
that Movant's criminal agreement involved _only_ powder cocaine.

It is both morally and legally wrong to threaten another per-
son; however, the immoral and illegal behavior attributed to Mo-
vant in the matter of the contents of the letter sent to Miss
Nathan does not establish a violation of 3C1.1.  What the Proba-
tion Officer in this case moved the Court to do is participate
in abusing the Guidelines to punish Movant for offensive behavior
not otherwise punishable except by indictment under 18 U.S.C. Sec-
tion 1512(a)(2).  The Government did not choose to indict under
18 U.S.C. Section 1512(a)(2), and the law does not allow for the
type of "alternative" prosecution, where the Government gets to
substitute a closely related but otherwise inapplicable Guideline
for an applicable statute the Government chooses not to invoke.

Trial counsel objected to the enhancement under USSG Section
3C1.1 but the issue _was_ _not_ pursued on appeal.  Movant cites in-
effective assistance of appellate counsel for failure to pursue
the issue, where a contemporaneous objection had been made to the
sentence enhancement under USSG 3C1.1, and where the enhancement

related to the amount of actual time Movant would have to spend in prison.  It was therefore "objectively unreasonable" under Strickland v. Washington, 466 U.S. 668 (1984), for appellate counsel to ignore the issue, and Movant was actually prejudiced by appellate counsel's deficient performance regarding the obstruction enhancement because there is reasonable probability that, "but for counsel's error, the result of the (appellate) proceeding would have been different."  466 U.S. at 689.

Movant's base offense level was 32.  Without the Obstruction of Justice enhancement, Movant would have been entitled to a three-point reduction in his base offense level for acceptance of responsibility pursuant to 3E1.1.  This reduction was withheld from Movant based on the probation officer's recommendation that "defendant is not deserving of a reduction for acceptance of responsibility."  PSR at 215-225.

The probation officer cites the alleged obstruction of justice, detailed above, and the fact that Movant had been arrested while out on bond for "burglary to auto" on February 19, 2002. However, all charges in the burglary case were dismissed against Movant so that only the alleged obstruction of justice could be used to deny Movant a sentencing reduction under USSG Section 3E1.1 for acceptance of responsibility based on his timely entrance of a plea of guilty to the charges in this case.

Thus, instead of being sentenced at level 34, criminal his-

tory category II, Movant should have been sentenced at base of-
fense level 29, criminal history category II for a sentencing
range of 97 to 121.  Instead, Movant was sentenced to 180 months
imprisonment based on a sentencing range of 168 to 210.  Thus,
Movant was actually prejudiced by the obstruction of justice find-
ing and by appellate counsel's failure to raise the claim on di-
rect appeal because it was a winnable claim based on an "unrea-
sonable" application of the Sentencing Guidelines. Movant was
entitled to the effective assistance of counsel on direct appeal
under Evitts v. Lucey, 469 U.S. 387, 83 L.Ed 2d 821, 105 S.Ct.
830 (1985).  Where a prisoner's sentence was increased based on
counsel error, the increase in sentence establishes prejudice
under Strickland. Glover v. United States, 531 U.S. 198, 148
L.Ed 2d 604, 121 S.Ct. 696 (2001).

    In the instant case, Movant's sentence was erroneously en-
hanced and trial counsel objected thereto. However, Movant's
Sixth Amendment right to the effective assistance of counsel
was violated when appellate counsel failed to raise the claim.
Accordingly, this Court should find that the procedural bar un-
der United States v. Frady for failure to raise this claim on
direct appeal does not apply in this case because Movant has
demonstrated both cause and actual prejudice to otherwise ex-
cuse his failure to raise this claim on direct appeal. 456 U.S.
152, 71 L.Ed 2d 816, 102 S.Ct. 1584 (1982).

    Movant did not obstruct justice when he wrote a letter to

his ex-girlfriend to move her to come to court to tell the truth.
The Government did not meet its burden under the lesser standard
of a preponderance of the evidence showing that the letter impeded
the investigation, prosecution, or sentencing in the instant case
or any related case. <u>King</u>, 338 F.3d at 799.

Accordingly, Movant respectfully request this Court to remand
this case for resentencing without the enhancement under 3C1.1 be-
cause the Government's attorney and/or the Probation Office fail-
ed to show in what way Movant's letter had impeded the investiga-
tion, prosecution, or sentencing in this case; or, this Court
should respectfully remand this case for an evidentiary hearing
so that Movant can present Miss Nathan to the Court to explain
that the Government's informer, Steven Redmon, is the person who,
in fact, obstructed justice by threatening to get Miss Nathan
indicted if she appeared in court on Movant's behalf to tell the
truth, regardless to whether Mr. Redmon actually had such influ-
ence with the U.S. Attorney's Office or not.  Allowing Movant an
evidentiary hearing in which he could call Miss Nathan to testi-
fy truthfully would also aid the Court in determining Movant's
claim that his criminal agreement with      Castillo <u>only</u> em-
braced powder cocaine, where Miss Nathan could positively testi-
fy that Movant <u>did</u> <u>not</u> deal in crack cocaine and had entered into
an agreement with the CI, Mr. Redmon, to procure on behalf of Mr.
Redmon <u>only</u> powder cocaine.

Alternatively, Movant respectfully request this Court to

(34)

grant a certificate of appealability should this Court deny all
of the above requested relief.

### GROUND THREE

III. WHETHER MOVANT WAS DENIED HIS SIXTH AMENDMENT RIGHT
TO COUNSEL ON DIRECT APPEAL, WHERE TRIAL COUNSEL HAD
FILED A MOTION TO WITHDRAW GUILTY PLEA DUE TO INEF-
FECTIVENESS OF PRIOR DEFENSE COUNSEL, BUT APPELLATE
COUNSEL FAILED TO RAISE THE PRESERVED CLAIM ON AP-
PEAL?

A.    Argument

On May 2, 2002, Movant appeared before this Court and pled
guilty to one count of conspiracy to distribute narcotics. At
that time, Movant was represented by attorney Raul Villalobos.
Movant later filed a Motion to Withdraw Guilty Plea, filed on
August 20, 2002, based on the fact that his plea on May 2, 2002
was not knowing, intelligent, or voluntary under Brady v. United
States, 397 U.S. 742, 25 L.Ed 2d 747, 90 S.Ct. 1463 (1970), be-
cause not entered into with the advice of competent counsel. See,
Tollett v. Henderson, 411 U.S. 258, 36 L.Ed 2d 235, 93 S.Ct. 1602
(1973).

As shown by the record, Movant first appeared on April 25,
2002, but did not plead guilty because his (then) defense coun-
sel, Raul Villalobos, indicated to the Court that he had been
having difficulties communicating with Movant.  Movant had to
address this Court on his own behalf, even though retained coun-
sel, Mr. Villalobos, was present, concerning the lack of any
plea negotiations.  Accordingly, the Change of Plea hearing was

(35)

postponed.

Movant then appeared on April 30, 2002, and the Government proffered a signed plea agreement to this Court (April 30, 2002 Transcript). Movant's plea colloquy began at this time but was not completed because Movant asserted that he had not received a copy of the indictment or discovery materials from his counsel, Mr. Villalobos (April 30, 2002 Transcript). Thus, it was apparent that Mr. Villalobos had induced Movant to sign the plea agreement without having supplied Movant with the information necessary to making an informed decision and choice as to whether or not Movant should elect to go to trial. This Court had to order copies of what had been requested by Movant, which is admirable on the part of the Court, but which signally shows the type of representation Movant was receiving from Mr. Villalobos, in addition to the difficulty in communicating.

The Motion to Withdraw Guilty Plea adequately stated reasonable grounds why Movant should be allowed to withdraw his plea of guilty. See, e.g., "Defendant's Response To Government's Response To Defendant's Motion To Withdraw Guilty Plea," filed on November 04, 2002. In addition to the reasons stated by replacement counsel, Mr. Raymond L. Prusak, Movant would argue that Mr. Villalobos representation was deficient for failure to investigate the scope of the criminal agreement Movant had entered into and which was reasonably foreseeable under United States v. Edwards, 945 F.2d 1387 (7th Cir. 1991).

(36)

This Court denied Movant's Motion to Withdraw Guilty Plea; however, the issue had been properly raised and preserved for appellate review. Thus, appellate counsel had adequate opportunity to review the record of proceedings in this Court and to determine viable issues for appellate review.

Movant contends that appellate counsel, Mr. McGowan, denied Movant the effective assistance of counsel on direct review. This contention states a Sixth Amendment claim which is reviewable by this Court under Title 28 U.S.C. Section 2255 and the specific holdings of the Supreme Court in Evitts v. Lucey, supra, 469 U.S. 387 (1985). What Movant is essentially requesting this Court to determine under Evitts v. Lucey, supra, and Strickland v. Washington, supra, is whether appellate counsel's decision not to raise the claim of this Court's denial of the Motion to Withdraw Guilty Plea was objectively unreasonable based on the files and records available to appellate counsel. Secondly, Movant would ask this Court to determine whether Movant has adequately demonstrated prejudice for appellate counsel's alleged deficient performance.

Consideration of the above claim, as regards the prejudice prong, will require this Court to determine whether or not its own ruling was proper. While the integrity of this Court is unassailable, and while this Court behavior during the pleadings concerning the Motion to Withdraw the plea displayed an abundance of caution in favor of basic fairness to Movant, the question re-

mains whether any judge should be put in a position to determine whether or not his own prior ruling left room for defense appellate counsel to reasonably question whether the District Court's ruling was according to law, that is, whether it would be frivolous or fruitless to raise such a claim on appeal.  Accordingly, if this Court feels that it can make such an impartial, unbiased determination of the issue, then Movant would respectfully request this Court to do so --- and Movant would accept such a decision as being impartial and unbiased.  If, however, this Court should feel such a decision is best made by a judge who has not previously ruled on the merits of the issue, then Movant would respectfully move the Court to transfer this one issue to any other judge of this Court's choosing.

B.    Argument

The Seventh Circuit has held that "defendants do not have an absolute right to withdraw their guilty pleas," United States v. Pike, 211 F.3d 385 (7th Cir.2000), citing United States v. Schilling, 142 F.3d 388,398 (7th Cir.1998), but that "a judge may permit an individual to withdraw his plea, upon the filing of the proper motion, if the defendant presents a 'fair and just' reason for doing so to the court," see, Fed.R.Crim.P. 32(e); United States v. Abdul, 75 F.3d 327,329 (7th Cir.1996), but the burden of justifying relief always rests with the defendant. See, United States v. Coonce, 961 F.2d 1268,1275 (7th Cir.1992).

In the instant case, Movant contends that the files and re-

cords indicate that Movant first appeared before this Court on or about April 25, 2002, for the purpose of changing his previously entered "not guilty" plea to a plea of guilty, and that he was represented by Mr. Villalobos. The transcript of that hearing, presently unavailable to Movant but referred to in Movant's Response Brief, filed on November 4, 2002, indicates that Movant's representative addressed this Court and explained that he, (counsel), was having great difficulty communicating with Movant. This was not indicative of a "breakdown" in communications between an attorney and client; rather, the problem to which Attorney Villalobos addressed the Court concerned a failure to communicate <u>at all</u>, that is, relevant to the legal issues in this case. Mr. Villalobos could not articulate the word symbols necessary to reach Movant's comprehension level in a manner to properly advise Movant as to the law applicable to the facts of this case so that Movant could make a knowing, intelligent, voluntary choice about whether to plead guilty or go to trial.  <u>See</u>, April 25, 2002 Transcript; <u>and see</u>, Declaration of Frank Rodriguez at <u>Exhibit 2</u>.

The difficulty in communications between Mr. Villalobos and Movant, described above, <u>was not</u> bridged in subsequent proceedings, despite this Courts attempts to ensure Movant received information relevant to making an intelligent choice among alternatives open to him.

Subsequent proceedings dealing with Movant's entrance of his plea of guilty indicate continued problems with respect to the re-

presentation of Movant by Mr. Villalobos. For example, in the next
Change of Plea proceeding, a plea agreement was proffered by the
parties containing Movant's signature and presented to the Court
in the hearing on April 30, 2002. However, despite the fact that
the plea agreement has been signed by Movant, Movant revealed to
this Court the fact that he had not received from his attorney a
copy of the indictment nor any of the discovery materials, and this
lack of information, coupled with counsel's admitted difficulty in
communicating with Movant clearly raised a question as to whether
Movant had been properly advised about his charges and the evidence
so as to enter a knowing plea. This Court chastised counsel in open
Court and ordered that a copy of the indictment and discovery ma-
terials be supplied to Movant. This Court certainly and definitely
acted to protect Movant's interest, a fact which highlights a lack
of adequate representation on the part of Mr. Villalobos with re-
spect to the plea agreement and entrance of the plea of guilty.

Movant received the discovery ordered by the Court, but fail-
ed to receive adequate advise from counsel as to the law. Replace-
ment counsel, Mr. Raymond L. Prusak, pointed out the fact that in-
spite of both Movant's and this Court's best efforts, Movant had
not received proper representation from Mr. Villalobos and said
deficient representation had adversely affected Movant in that,
had Movant received reasonably effective representation, he would
not have entered a plea of guilty and, instead, would have elected
to go to trial. See, MOTION TO WITHDRAW, filed by Attorney Prusak

on November 4, 2002, attached as <u>Exhibit 4</u>.

The question, then, now before this Court is whether Movant
was denied his Sixth Amendment right to the effective assistance
of counsel on direct review, where appellate counsel failed to
raise a viable claim that had been properly raised and preserved
in the court below?  Movant contends that there was, for appellate
counsel, an adequate basis in the record to raise the claim that
the District Court had erred in denying Movant's motion to with-
draw his guilty plea, where a "fair and just reason" existed in
the record for the District Court to have granted the motion. <u>See</u>,
<u>Pike</u>, 211 F.3d at 388; <u>and see</u>, Rule 32(e), Fed.R.Crim.P.  Movant
further contends that, but for the deficient performance of appel-
late counsel, there is a reasonable probability that the result of
appellate review would have been different in that the Seventh Cir-
cuit, in all reasonble probability, would have found this Court's
ruling on the motion to withdraw to be an "abuse of discretion,"
under Seventh Circuit standard, <u>United States v. Salgaldo-Ocampo</u>,
159 F.3d 322,325 (7th Cir.1998), or "clearly erroneous" under
<u>United States v. LeDonne</u>, 21 F.3d 1418,1423 (7th Cir.1994)("A
factual determination is clearly erroneous only if, after con-
sidering all of the evidence, we are left with the definite and
firm conviction that a mistake has been committed." <u>United States
v. Messino</u>, 55 F.3d 1241,1247 (7th Cir.1995)).

Appellate counsel knew, or should have known, that the pre-
trial transcripts dated April 25, 2002, April 30, 2002, and May 2,

2002, provided facts upon which appellate counsel could have raised a viable claim that "a fair and just reason" existed in the record which supported allowing Movant to withdraw his plea of guilty, and that, therefore, this Court had abused its discretion, or had made a ruling that was clearly erroneous when this Court denied the motion, where the record/transcripts indicate that Movant's plea of guilty <u>had</u> <u>not</u> been knowingly, intelligently, or voluntarily entered into, <u>Brady</u>, 397 U.S. 742, with the advice of competent counsel, <u>Tollet</u>, 411 U.S. 258.

The transcripts of the Change of Plea hearings support the fact that Attorney Villalobos had been deficient in his representation of Movant for his admitted "difficulty" in communicating with Movant. The records indicate that, <u>after</u> counsel's admitted difficulty in communicating with Movant, counsel induced Movant to sign a plea agreement without having provided Movant even a copy of the indictment, nor <u>any</u> discovery materials, upon which Movant could base an intelligent decision regarding whether to go to trial or whether to enter a plea of guilty. These facts clearly demonstrate an "objective unreasonableness" under the first prong of <u>Strickland</u>, for counsel had attempted to "plead out" his client without providing any information that would go to Movant making an intelligent decision thereabout.

Though the records indicate this Court somewhat rectified counsel's deficient representation by ordering that discovery be provided to Movant, no amount of judicial oversight could rectify

the continued communication gap between counsel and client, so
that Movant was still left without counsel as regards understand-
ing the legal implications of the discovery materials. See, the
Declaration of Frank Rodriguez at Exhibit 2.

For example, the discovery material indicated a specific
agreement on the part of Movant with the Government's CI for Mo-
vant to procure powder cocaine on behalf of the CI. Furthermore,
the discovery materials indicate that such a conspiracy was enter-
ed into by Movant with Castillo to sell powder cocaine to the CI.
Thus, the discovery materials indicate that Movant brokered a drug
deal between two parties in which the agreed upon drug was powder-
ed cocaine.  When Movant brought the two parties together, powder-
ed cocaine was produced by Castillo for the CI. The CI and Castil-
lo then entered into a private, separate deal to turn the powder
into crack cocaine.  Movant did not participate in this arrange-
ment.  The CI had offered to pay "extra" to turn the powder into
crack.  Movant did not participate in "cooking" the cocaine, and
Movant derived no profit from powder turned to crack cocaine.

However, Mr. Villabobos failed to communicate any such legal
interpretation of discovery materials to Movant.  Never once did
Mr. Villalobos discuss with Movant any legal contention upon which
Movant could have gone to trial. For example, replacement counsel
argued before this Court the fact that Movant had been "entrapped"
by the Government, and although entrapment as a legal defense may
not have been viable in its pure sense, it is a fact that any change

in the drug of choice from powder to crack had been instigated
by the Government strictly for sentencing purposes, which pro-
vided a legal bases for an argument of sentencing entrapment,
an argument which Movant could have forwarded at trial in the
form of a request to the Court that a jury must determine the
"scope" of Movant's criminal agreement.  However, any such ar-
gument was lost on counsel whose only advice embraced entering
a plea of guilty to the charge in Count One.

Under Rule 52(b) of the Fed.R.App. P., appellate counsel
could have expanded upon the defense's preserved objection in
the District Court to raise any related claim uder a plain er-
ror review.  Such an requested review could have contained the
argument that there was no factual basis for a plea of guilty
to crack cocaine on Movant's part, and that, therefore, the
Court should have allowed Movant to withdraw his plea of guilty.

Movant's plea was not knowing, intelligent, or voluntary
because he did not have "reasonably effective assistance" at
the time he entered his plea of guilty. Appellate counsel could
have, but failed to, raise the claim that the District Court
had erred in allowing the plea to stand.  There is a reasonable
probability that, had appellate counsel raised the claim, the
result of the Seventh Circuit's decision in Appeal No. 02-4344
would have been different. See, United States v. Malone, 22 F.3d
145,147 (7th Cir.1994). Thus, Movant was actually prejudiced by
appellate counsel's failure to raise the claim that this Court

(44)

had abused its discretion, or clearly erred, when it denied Movant's Motion to Withdraw Guilty Plea.

Accordingly, Movant respectfully request this Court to remand this case on a finding that Movant was denied his Sixth Amendment right on direct appeal for the reasons stated above. The proper remedy would be to allow Movant the opportunity to present this claim on appeal to the Seventh Circuit Court of Appeals and to appoint counsel on Movant's behalf to perfect appeal on this single issue.

Respectfully submitted,

Frank Rodriguez
Reg. No. 13950-424
FCI Beckley
P.O. Box 350
Beaver, WV 25813

STATE OF ILLINOIS}
                 }
COUNTY OF COOK   }

## **AFFIDAVIT**

I, Frank L. DePodesta, being duly sworn, depose and state as follows:

1.   I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI), United States Department of Justice, Chicago, Illinois.  I am an investigative and law enforcement officer of the United States, who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in the Title 21 of the United States Code.

2.   I am a Special Agent of the FBI and have been so employed for over five and a half years.  I am currently assigned to a Drug Squad of the FBI Office in Chicago, Illinois.

3.   I have received special training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code.  Specifically, I have received training in all aspects of the investigation of narcotics trafficking.  In connection with my duties as a FBI agent, I have participated in numerous cocaine and marijuana trafficking investigations, have used and become familiar with all normal investigative techniques, including but not limited to various types of surveillance, the use of pen registers, undercover operations, debriefing of defendants, witnesses, and informants having knowledge of the distribution and transportation of controlled substances, and the laundering and concealing of proceeds from

1

MOVANT'S EXHIBIT 1

drug trafficking.  Through my training and experience, I have become familiar with the methods used by narcotics traffickers in conducting their business.

4.    This affidavit is submitted in support of an application for the issuance of a warrant to search 3328 West 65th Place, Chicago, Illinois.  Specifically, permission is sought to search the basement area and detached garage at this address.

5.    The address located at 3328 West 65th Place, Chicago, Illinois is further described as a one and a half story building with white siding surrounded by a black wrought iron fence located on the North side of 65th Place in the middle of the block in Chicago, Illinois.  The address is displayed in gold colored numerals over top of the front door to the residence. The residence has a driveway on the West side of the residence running from 65th Place to a white colored one car detached garage located behind the residence.

6.    The following information is based upon my own personal observations, knowledge, and information received from other Federal law enforcement Officers, local law enforcement officers, and a cooperating witness, referred to in this affidavit as "CW."

7.    The FBI is currently investigating an individual named Francisco Rodriguez who is a member of a cocaine and marijuana drug trafficking organization operating in the Chicago, Illinois area.  This organization is believed to have direct ties with members of a drug trafficking cartel based in Mexico.

2

CAS                                                    295

8.    In about late May or early June of 2001, the CW was
introduced over the telephone, and later met, an individual named
Francisco Rodriguez, also known as "Frankie Hustle", herein
referred to in this affidavit as "Rodriguez."  The CW was
introduced over the phone to Rodriguez by a common friend.
During that initial conversation, Rodriguez offered to sell the
CW quantities of both marijuana and cocaine.

9.    On June 4, 2001, the CW had an unplanned meeting with
Rodriguez at a restaurant in Chicago, Illinois.  At this meeting,
Rodriguez offered to provide the CW with free samples of both
cocaine and marijuana.

10.    Later that evening, Rodriguez met the CW at a
McDonald's restaurant in Chicago and provided the CW with free
samples of cocaine and marijuana.  This meeting was observed by
FBI agents and the CW was wearing a concealed recording device
which recorded the conversation.  Law enforcement agents searched
the CW before the meeting.

11.    At this meeting, Rodriguez told the CW that he worked
for his cousin distributing cocaine and marijuana.  When
Rodriguez provided the CW with the samples of cocaine and
marijuana, he told the CW that the sample of cocaine was broken
off the kilogram brick and that the sample of marijuana was good
because it was taken from a load of marijuana that had just
arrived in Chicago from Mexico.  Rodriguez told the CW to call
later that evening and he would check with his cousin to obtain a
price for selling the CW crack cocaine.

3

12.   The samples of both cocaine and marijuana were field tested.   Both samples yielded positive results for cocaine and marijuana respectively.

13.   On June 6, 2001, Rodriguez and the CW spoke over the telephone.   Rodriguez told the CW that he would be able to provide the CW with three (3) ounces of crack cocaine for "three stacks" which the CW understood to mean $3,000.

14. In a phone conversation on June 6, 2001, Rodriguez told the CW that he was going to introduce him to his cousin, and that the cousin would be involved in the crack cocaine sale.

15.   In a conversation in the morning of June 7, 2001, Rodriguez described the place where they would conduct the narcotics transaction as a house at 65th Place and Kedzie, near a Burger King Restaurant.   Rodriguez described the house as being in the middle of the block and as the only white house with black fence.

16.   Later that day, at about 11:30 a.m., the CW called Rodriguez to check on the status of their narcotics transaction. Rodriguez told the CW that he had to call his cousin to check. Shortly thereafter, Rodriguez called the CW back and told the CW that the cocaine was being cooked right now.   Rodriguez told the CW that within the hour he would call back and at that time they would meet at a Kentucky Fried Chicken restaurant located at the corner of Western Avenue and Fullerton Avenue.   Rodriguez told the CW that he would then get in the CW's car and they would drive to get the crack cocaine from his cousin.   Rodriguez

4

further explained that he wanted the CW to drive because if they were stopped by the police with the cocaine the CW would get in trouble and not him because he would not be driving.

17. On this same day, at approximately 1:30 p.m., Rodriguez called the CW and instructed the CW to call his cousin Pedro and provided pager telephone number (773) 231-8134, and a number that Pedro could currently be reached at (708) 609-5439.

18. After speaking with Rodriguez, the CW called telephone number (773) 609-5439 and spoke to Rodriguez' cousin, Pedro. Pedro instructed the CW to pick up Rodriguez and bring Rodriguez to his house. Pedro told the CW that Rodriguez knew where the house was. Pedro told the CW that they would sell the crack cocaine to the CW for "three stacks," which the CW understood to mean $3,000.

19. At approximately 3:45 p.m., Rodriguez called the CW and told the CW to meet him at the Kentucky Fried Chicken restaurant in about twenty (20) minutes.

20. At approximately 5:00 p.m., the CW, who was equipped with a concealed recording device, met Rodriguez at the Kentucky Fried Chicken restaurant. This meeting was observed by FBI agents and Chicago Police Department officers. Before the meeting, both the CW and the CW's vehicle were searched by law enforcement agents, and the CW was given $3,000 in buy money.

21. After arriving at the restaurant, Rodriguez parked his vehicle and got into the CW's vehicle. They then drove, followed by law enforcement agents, to 3328 West 65th Place, Chicago,

5

Illinois.

22.   As the CW drove west on 65th Place, Rodriguez pointed to the residence at 3328 West 65th Place as they passed and told the CW that this was the house they were going.  He instructed the CW to drive into the alleyway and park inside the garage behind this residence.

23.   As soon as they exited the vehicle inside the garage, the CW was physically searched by Rodriguez and Pedro for a wire or transmitter.  The concealed recording device the CW was wearing was not discovered.  As soon as they finished, Rodriguez and Pedro told the CW that they wanted to make sure that they could trust him.

24.   After the CW was searched, Pedro retrieved what appeared to be about 3 ounces of powder cocaine from a drawer of a workbench in the garage.  Pedro showed the cocaine to the CW and allowed him to smell it.  Pedro told the CW that from the smell of it the CW could tell it was the same quality as the sample of cocaine he provided the CW days earlier.

25.   Rodriguez, Pedro, and the CW then entered the residence.  To enter the house, they went down a short flight of stairs.  The residence is a 1 1/2 story building.  The men went into a kitchen area in the basement of the house.  In addition to the kitchen area, the CW saw a bathroom and a hallway that led to a front area in the basement.

26.   Inside the residence was another man, but the CW was not introduced to that man.  This individual did not speak much

6

but appeared to be in charge of both Pedro and Rodriguez.

27.    Inside the residence Pedro began cooking the powder cocaine into crack cocaine.  First, Pedro cooked one (1) ounce of powder cocaine into crack cocaine and then cooked two (2) ounces of powder cocaine into crack cocaine.  While inside the residence, the CW observed Pedro using bowls, knives, spoons, and other paraphanelia to cook the powder cocaine into crack cocaine.

28.    While Pedro was cooking the cocaine, he told the CW that he does not live at the house but that he was always there because the house was where he cooks and distributes narcotics.

29.    While at the residence, the CW overheard Pedro speaking on the telephone to someone.  From the conversation the CW overheard, it appeared that Pedro arranged to sell cocaine during the call and told the person to come to the house to retrieve the cocaine.  After Pedro got off the telephone, he told the CW that the person he was talking to was going to pick up six (6) ounces of the same stuff that the CW was buying.  Pedro also told the CW that he had four (4) people lined up waiting to purchase narcotics.

30.    The CW observed Pedro retrieve 2 small baggies of what appeared to be crack cocaine from a room in the front of the basement.  The CW saw Pedro walk towards a stairway leading upstairs, and realized that Pedro had left the house briefly. Pedro did not have the two baggies when he returned to the kitchen area.

31.    While at the house, the CW gave Pedro the $3,000 in

7

exchange for the crack cocaine.  Pedro took the money, counted it, and then placed it in a freezer located in the kitchen area.

32.  During conversation with the CW, Pedro indicated that he had other people provide "security" for the house.

33.  Prior to leaving, the CW asked Pedro about purchasing more crack cocaine at a later date.  Pedro told the CW that they would talk about that when the CW needed more, but added that whenever the CW needs more he (Pedro) would have it.  As they left, the individual who appeared in charge told the CW to be careful.

34.  At approximately 8:12 p.m., the CW and Rodriguez departed 3328 West 65th Place, Chicago, Illinois and were followed by FBI agents and Chicago Police Department officers as they drove back to where Rodriguez' vehicle was parked. Rodriguez then entered his vehicle and drove away.  The CW was followed to a pre-arranged location and provided approximately three (3) ounces of crack cocaine to the Affiant.

35.  On June 8, 2001, this crack cocaine was field tested, processed into evidence, and submitted to the Drug Enforcement Administration North Central Laboratory for analysis.  The crack cocaine had a gross weight of approximately 105.5 grams when submitted to the lab and yielded a positive reaction for the presence of crack cocaine when field tested.

36.  On June 18, 2001, Public Source records were searched and revealed that on March 16, 2001, an individual named Pedro L. Castillo reported 3328 West 65th Place #1, Chicago, Illinois as

8

his address.  This individual, further identified as Pedro Luis Castillo is assigned Illinois Drivers License number C234-6727-4234.  While cooking cocaine inside 3328 West 65th Place, Chicago, Illinois, Pedro identified himself as Pedro to the CW, but also told the CW that he was also known as Louie, and that his friends called him Lou.

37.  A review of ComEd records shows that there is only one customer account listed for the house at 3328 West 65th Place, Chicago, Illinois.  The billing information for that account does not list Pedro Luis Castillo.

38.  A review of public records shows that the residence at 3328 West 65th Place, Chicago, Illinois, is owned by four individuals, none of whom are named Pedro Luis Castillo.

39.  On June 18, 2001, the CW placed consensual recorded telephone calls to Pedro at telephone number (708) 609-5439.  In these conversations, the CW asked Pedro if he had seven (7) or eight (8) ounces of the same stuff that he previously sold the CW.  Pedro told the CW that he had the cocaine, but that cooking eight ounces of cocaine would take too long.  Pedro then agreed to sell the CW seven (7) ounces of crack cocaine on June 20, 2001 for approximately $7,000.  Pedro told the CW that he would start cooking the cocaine either that night or the following day and have it ready for the CW when he called on June 20, 2001.  Pedro instructed the CW to call sometime after 8:00 a.m. and they could meet somewhere to conduct the transaction.

40.  On June 19, 2001, the CW was shown a lineup which

9

included a photograph of the bearer of Illinois Drivers License
number C234-6727-4234, in the name of Pedro Luis Castillo.  The
CW indicated that he recognized the individual in the photograph
of Pedro Luis Castillo, but was not sure of the identity of that
person.

41.  Through my training, my discussions with other
experienced agents, and my personal experience, I am familiar
with the methods, schemes and operations used by drug traffickers
and know that such traffickers commonly:

a.   maintain ledgers, books, or other records relating
to the transportation, purchase, packaging, sale and distribution
of controlled substances;

b.   maintain books, photographs, or papers which
reflect the names, addresses and/or telephone numbers of their
suppliers, couriers, customers and other associates in the
illegal drug trade;

c.   maintain the aforementioned books, papers and
documents in secure locations within their residences and/or
places of business so that the drug traffickers have ready access
to such information;

d.   conceal in their residences and/or places of
business the proceeds of their illegal activity, including large
amounts of United States currency, financial instruments, and
other items of value, as well as books and records regarding the
acquisition, use and disposition of such items of value;

e.   that when drug traffickers amass large proceeds

10

from the sale of controlled substances, they attempt to legitimize these profits, often accomplishing this goal by using the services of foreign and domestic banks, other financial institutions, and real estate brokers; and that books and papers related to such efforts, including, but not limited to, cashier checks, money orders, telegram, telexes, letter of credit and ledgers, are maintained in the residences and/or places of business of the drug traffickers;

       f.   that drug traffickers very often place assets, including real and personal property, such as vehicles, in names other than their own to avoid the detection and forfeiture of such assets by government agencies; and the drug traffickers continue to use these assets and to exercise dominion and control over them even though the assets are nominally owned by others; and

       g.   drug traffickers often use firearms and other weapons to provide security and protection for the places where they do business and/or store financial proceeds from their business.

      42.  The Affiant believes that based on the above information, there is probable cause to believe that the basement area of the residence and the detached garage located at 3328 West 65th Place, Chicago, Illinois, as described in particular in Attachment A, contains evidence of a violation of Title 21, United States Code, Section 841(a)(1), in that there is probable cause to believe that this basement area and garage contains

11

property that constitutes evidence of the commission of a criminal offense; or contraband, the fruits of crime, or things otherwise criminally possessed, including the items described in Attachment B.


        FURTHER AFFIANT SAYETH NOT



                        _____
                        Frank L. DePodesta, Special Agent
                        Federal Bureau of Investigation



Sworn before this 20th day
of June, 2001
_____
Nan. R. Nolan
UNITED STATES MAGISTRATE JUDGE



12


CAS                                        305

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,     )
                          )
       Plaintiff-Respondent,  )   CIVIL NO. (to be supplied by Clerk)
                          )   CRIM. NO. 01-CR-567-2
-vs-                     )
                          )
                          )
FRANK RODRIGUEZ,         )   HON. JAMES F. HOLDERMAN,
                          )   UNITED STATES DISTRICT JUDGE
       Defendant-Movant.     )

## DECLARATION OF FRANK RODRIGUEZ

I, Frank Rodriguez, pursuant to Title 28, United States Code, Section 1746, make the following statements:

1.   I was the defendant in the above styled criminal case.

2.   Attorney Raul Villalobos was retained by my family to represent me in the above styled criminal case.

3.   Mr. Villalobos never discussed with me any possible defense to the charges made against me.

4.   Mr. Villalobos failed to provide me with even a copy of the indictment or any discovery materials before advising me to plead guilty.

5.   I did not know the elements of the offense for which I had been charged, and Mr. Villalobos failed to inform me of what evidence the government had to prove the charges against me.

6.   I got involved in this case at the instigation of my (then) girlfriend, Britane Nathan, who informed me about a guy she had met who wanted to buy some powder cocaine and some marijuana.

7.   I did not know the man Miss. Nathan introduced me to was a government informant, ("CI").

8.   The CI and I talked on the telephone and came to an agreement that I would procure some ounce quantities of powder cocaine for him and some marijuana.

9.   I did not personally deal in ounce quantities of cocaine

(page 1 of 3)

MOVANT'S Exhibit 2

at the time I met the CI, nor did I deal in crack cocaine.

10.  I went to a long time friend to inquire about the powder
cocaine and marijuana which I had agreed to procure for the
CI.  I went to Fredo Castillo.

11.  I explained to Mr. Castillo that someone wanted to pur-
chase some powder cocaine and some marijuana, and I asked him
if he could handle the deal.

12.  Mr. Castillo advised me that he could provide ounce quan-
tities of cocaine for $1,000.00 an ounce, and that he would
provide me with a sample of both powder cocaine and marijuana.

13.  I provided the CI, who I knew as Steve, with the sample
of powder cocaine and marijuana that Mr. Castillo had provided
to me, and within days, the CI telephone me to purchase three
ounces of cocaine.

14.  I never communicated to Mr. Castillo that the CI wanted
crack instead of powder cocaine, and Mr. Castillo and I never
entered into an agreement to provide the CI with crack cocaine.

15.  Finally, on the day that Mr. Castillo and the CI met face
to face, Mr. Castillo asked me to drive the CI to Mr. Castil-
lo's place of operation, which I agreed to do.

16.  When the CI and I reached Mr. Catillo's place, Mr. Cas-
tillo pulled out a bag containing powder cocaine which he al-
low the CI to hold and sniff by placing his face down into
the large plastic baggie and inhaling.

17.  Sometime soon after, the CI complained that he wanted
crack instead of powder, and he asked Mr. Castillo how much
Mr. Castillo would charge to process the powder cocaine in-
to crack-cocaine.

18.  I had no part in the decision of the CI to want crack
cocaine instead of powder cocaine, and I had no part in Mr.
Castillo's decision to convert the powder into crack.

19.  I had no fore knowledge that the powder cocaine would
be converted into crack cocaine.

20.  I did not involve myself with crack cocaine under any
circumstances because I knew the difference in penalties and
so never got involved with crack and would not have gotten
involved with either the CI or with Castillo if crack had
been mentioned initially by the CI or if Castillo had informed

me that he had a sample of crack cocaine for me to give to
the CI.

21.   I left Mr. Castillo's residence and went to the store
to buy some beer and Alfredo Berrera accompanied me, and even
when I returned, I took no part in helping Mr. castillo pro-
cess the powder into crack.

22.   I was never paid any thing for my part in procuring co-
caine for the CI. When I called him to get some money from
the CI for bringing him and Mr. Castillo together, the CI
refused to pay me, and Mr. Castillo subsequently gave me
nothing.

23.   My counsel, Mr. Villalobos, never discussed with me
the scope of the conspiracy I had entered into as a possi-
ble defense against the charges I faced relating to crack,
rather tan powder, cocaine.

24.   I did not know how to apply the law to the facts of my
case, and Mr. Villalobos never advised me as to the law.

25.   I had great dificulty communicating with Attorney Villa-
lobos as he just did not seem to understand what I would be
trying to explain to him about my case, and I often did not
understand the "big words" he used.

26.   I did not know Pedro Castillo was involved in an on-
going conspiracy with Alfredo Berrera at the time I contacted
Pedro Castillo to procure cocaine for the CI, Steven Redmon,
sometime in late May 2001 or early June 2001.

Executed under penalty of perjury on this the 20th day of

November, 2007.

DECLARANT

(page 3 of 3)

FD-302a (Rev. 10-6-95)

281C-CG-115992-302

Continuation of FD-302 of ___Pedro Luis Castillo_____ , On _11/13/2001_ , Page ___2___

quality. CASTILLO discussed the possibility of purchasing cocaine from "Chino" in the future. "Chino" provided CASTILLO with his cellular telephone number and told CASTILLO to contact him if he needed anything.

[redacted] CASTILLO contacted "Chino", went to his residence, and obtained a sample of cocaine which he passed on to RODRIGUEZ.

[redacted]

"Chino" told CASTILLO he got his cocaine from his aunt, who in turn got it from her brother, "Chino's" uncle. "Chino" provided the cocaine for the three and seven ounce crack cocaine deal and was present for both deals because CASTILLO could not pay for the drugs up front and he refused to front the cocaine. CASTILLO observed "Chino" obtain both the three ounce and seven ounce quantities of cocaine from "Chino's" aunt at her residence off 56th and Albany. CASTILLO thought the aunt stored cocaine in the house in an area where some children stayed because on each occasion, the aunt would send the children out of the house before retrieving the cocaine. CASTILLO recalled a total of six visits to "Chino's" aunts house, four to pick up cocaine, and two social visits.

[redacted] to get drugs was to obtain the three ounce of cocaine for the deal with RODRIGUEZ. The third time was to obtain

*MOVANT'S EXHIBIT 3*

CAS                                                                    334

**FILED**

NOV 0 4 2002 *rq*

MICHA*** *. *****INS
CLERK, U.* *.***.*T COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA        )
                                )
v.                              )       No. 01 CR 567-2
                                )       Judge James F. Holderman
FRANK RODRIGUEZ                 )
                                )

**DOCKETED**

NOV 0 7 2002

## DEFENDANT'S RESPONSE TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA

Now comes RAYMOND L. PRUSAK, attorney for FRANK RODRIGUEZ, Defendant, responds to the government's response to Defendant's motion to withdraw his guilty plea as follows.

### Background

On May 2, 2002, Defendant, Frank Rodriguez, appeared before this Court and, under oath, pled guilty to one count of conspiracy to distribute narcotics. Due to ineffective assistance of counsel, an incomplete understanding of the case presented against the Defendant and lack of knowledge, the motion to withdraw the Defendant's guilty plea should be granted.

Defendant first appeared on April 25, 2002, and did not plead guilty on this date because his defense counsel, Raul Villalobos, indicated that he had difficulties communicating with the Defendant. Villalobos at this time did not mention anything about any type of plea negotiations, the Defendant had to bring it up. At this time there was a lack of communication between Villalobos and the Defendant, which goes to show ineffective assistance of counsel because Villalobos cannot represent the best interest of his client if he has no idea what that interest is because Villalobos is unable to communicate with the Defendant. (April 25, 2002 Transcript, at 3-5, attached as Exhibit A).

MOVANT'S Exhibit 4

124

Defendant then appeared on April 30, 2002, and the Government tendered a signed plea agreement to the Court (April 30, 2002 Transcript, at 5 attached as Exhibit B). Defendant's plea colloquy began at this time but was not completed because the Defendant asserted that he had not received a copy of the indictment or discovery materials form his counsel, Raul Villalobos (April 30, 2002 Transcript, at 10-11). Villalobos has not been completely forthright with the Defendant. Villalobos had the Defendant sign a plea agreement prior to supplying the Defendant with all of the information he had requested at a meeting prior to signing the ill informed plea agreement. The Court had to order copies of what had been requested by the Defendant, which shows that Villalobos either did not care or understand what his client wanted, which goes to show an ineffectiveness of counsel (April 30, 2002 Transcript, at 10-15). The Defendant and Villalobos are having a great deal of difficulty communicating, which suggests that the signed plea agreement was not actually fully described to the Defendant in a manner which would allow him to make a knowing and voluntary plea of guilty.

Defendant then appeared on May 1, 2002, at which time the Defendant stated that he had received the discovery materials, which Villalobos failed to give him upon his request, around 5:00 p.m. the previous day, which did not give him enough time to review all of the material (May 1, 2002 Transcript, at 3 attached as Exhibit C). At this time the Defendant also stated that he needed at least two more days to review the material due to the amount of information he was given (May 1, 2002 Transcript, at 2). The Court then had a discussion with the Government in regards to the deadline for filing a plea agreement and determined that the Defendant would be given only one additional day to review the material which had been supplied just the other day (May 1, 2002 Transcript, at 3-7). The Court finally decided to allow the Defendant an additional 23 hours to review the material that was to be used against him if he decided to go to trial (May

1, 2002 Transcript, at 7). This discovery material, which he was supposed to sift through, was to be used to determine, without the assistance of counsel, whether he should sign a plea agreement and spend a large portion of his life in a federal prison. The Court only allowed the Defendant an additional 23 hours to review the material that was going to change his life forever. Whether the Defendant was given a full 23 hours is arguable because the Marshall could not determine if he would be able to supply a viewing area for the Defendant for the entire time and given the previous days delay in getting the Defendant the materials (May 1, 2002 Transcript, at 3-5). It should also be noted that Villalobos did nothing in support of obtaining more review time for the Defendant. The only mention of time from Villalobos is when the Court asks for a good time to call the case the next day and Villalobos mentioned that he has a lot of cases, but that he could make some changes to accommodate the Court, this shows that Villalobos is acting in his own interest, concern for his other cases, and does not seem to care or acknowledge the interest of the Defendant (May 1, 2002 Transcript, at 6-7).

Finally on May 2, 2002, the Defendant entered a plea of guilty (May 2, 2002 Transcript, at 25, attached as Exhibit D). Although the Defendant signed and agreed to everything the Court asked him during the colloquy, the Defendant still did not understand what type of sentence he was looking at because Villalobos himself did not understand what sentencing guidelines the Court would be using. The Defendant did not understand the sentencing cap in regards to Count One (May 2, 2002 Transcript, at 4). This shows ineffective assistance of counsel because how is Villalobos supposed to advise the Defendant if he himself does not understand how the system works.

The Defendant has moved to withdraw his guilty plea, asserting that: 1) he is innocent; 2) that the plea colloquy was not sufficiently clear because the Court reprimanded defense counsel

3

for ill-advising Defendant as to Rule 11(e) sentencing cap provisions; and 3) his plea was not knowing and voluntary because defense counsel never provided the Defendant with a copy of the indictment, the pre-sentence report or the plea agreement.    These contentions justify the Defendant's motion to withdraw his guilty plea.

**Argument**

A judge may permit a defendant to withdraw his plea of guilty prior to sentencing only if the defendant presents a "fair and just" reason for doing so.  Fed. R. Crim. P. 32(e); *United States v. Pike*, 211 F.3d 385, 388 (7th Cir. 2000).  The burden of justifying relief is on the defendant.  *Pike*, 211 F.3d at 388.

## I.    Defendant Has Made a Showing Necessary to Withdraw His Plea Due To a Claim of Actual Innocence

The Defendant first seeks to withdraw his plea on the grounds that he is legally innocent of the crime charged in Count One.

The Defendant asserts that he has maintained his innocence throughout this case. Although the Defendant confessed to his commission of the crime upon his arrest, the Defendant maintains his innocence because he believes that his arrest was the cause of entrapment induced by the Government officials that arrested him.

Further, while legal innocence is a recognized and just reason for allowing a defendant to withdraw a guilty plea, the defendant must offer some "credible evidence" of his innocence to justify a withdrawal of a plea.  *United States v. Hodges*, 259 F.3d 655, 661 (7th Cir. 2001). However, a "defendant's bare protestations of innocence [ ] will not suffice." *Id.*  Here, the Defendant has not made a naked claim of innocence.  If allowed the Defendant will support his affirmative defense to Count One of entrapment with credible witnesses that he believes will

4

prove by a preponderance of the evidence that Government officials induced the Defendant to break the law leading to the charges alleged in Count One. Given the support of testimony from credible witnesses the Defendant's motion to withdraw his guilty plea should be granted.

## II.    The Court Did Not Fully Comply With the Mandates of Rule 11

The Defendant argues next that he should be permitted to withdraw his guilty plea because his plea colloquy lacked "clarity and completeness" and because the Court failed to comply with the dictates of Rule 11 in his plea colloquy. This is based on the fact that the Court reprimanded Villalobos for ill-advising the Defendant about the sentencing cap provision.

The Defendant's issue is not with Villalobos's description of the sentencing cap, or statutory maximum, but that of his lack of knowledge pertaining to the sentencing cap. Villalobos was hired as the Defendant's counsel to represent the best interest of the Defendant and advise the Defendant as to the matter at hand. The Defendant maintains that Villalobos was ineffective in both aspects, which is shown by his inability to communicate with the Defendant, his unresponsiveness towards the Defendant's requests for information and Villalobos's lack of knowledge pertaining to the procedural aspects of this court. Regardless if the Defendant was later admonished in open court, he did not truly understand what the admonishment meant due to the ineffective assistance of his defense counsel, Villalobos.

The Defendant's complaint does justify a withdrawal of his plea of guilty. Even though Villalobos's statement was corrected by the Court, the Defendant did not understand the proceeding admonishment because of the ineffective assistance of counsel. Accordingly, there is an error under Rule 11, and the plea of guilty should be granted.

5

### III.    The Plea Colloquy Does Not Establish That The Defendant's Guilty Plea Was Knowing, Intelligent and Voluntary Because The Defendant Did Not Understand It

Finally, the Defendant argues that he should be permitted to withdraw his plea because it was not knowing and voluntary because he did not receive a copy of the indictment, a copy of the pre-sentence report or the plea agreement prior to his signing it, all of which is being offered to show an ineffective assistance of counsel, which did not allow the Defendant to make a knowing, intelligent and voluntary plea of guilty. Although the record may read in detriment to the Defendant, he maintains that due to the lack of knowledge and the ineffective assistance of counsel his plea of guilty should be withdrawn.

Here the Defendant is not asserting that he was never given a copy of the indictment, a copy of the pre-sentence report or the plea agreement prior to his signing it, because that would contradict the record and his sworn admissions, but instead that he was not given enough time to review the materials and that due to ineffective assistance of counsel the materials he did have a chance to review were foreign to him of which he could not fully understand what was being reviewed.

As the record shows in a number of locations, the Defendant and Villalobos did not have the same ideas on the direction that the Defendant's case should follow. At times Villalobos kept information from the Defendant, which was later revealed only after the Court ordered that it be done. Upon extensive review of the record, it would seem that the Defendant would have been better off representing himself in this matter because Villalobos either did not want to work with the Defendant or did not care either way. Given the ineffective assistance by Villalobos the Defendant's motion to withdraw his plea of guilty should be granted in an effort to allow the Defendant Due Process by appointing or allowing the Defendant to find a competent attorney.

6

**U.S. Department of Justice**
Drug Enforcement Administration
North Central Laboratory

# CHEMICAL ANALYSIS REPORT

To:   Special Agent in Charge
219 S. Dearborn, R00m 905
Chicago, Illinois 60604

Date: August 02, 2001

Attn:   SA Frank I. DePodesta

## Case Number:  281C-CG-115992

### Analysis Summary and Remarks:

**Laboratory No.:**   138351
**Exhibit 1 contains:**   Cocaine Hydrochloride
**Gross Wt.:**   31.6 grams (g)
**Net Wt.:**  0.15 g
**Active Drug Ingredient:**  Cocaine Hydrochloride – 69%
**Amount of Pure Drug:**  0.10 g
**Reserve Wt.:**  0.09 g

_Jerry A. Dal Cason_ 10 Aug 01
Analyst Jerry A. Dal Cason
Senior Forensic Chemist
Date Completed: 07/19/01

_Ralph C. Cottrell III_ 8/15/01
Approved by Ralph C. Cottrell III
Laboratory Director
Laboratory Location:   Chicago, IL-mmm

Prosecution / Orig. Office / Laboratory / Hdqtrs / ...........................................Page 1 of 1

MOVANT'S Exhibit 5

Read Instructions on Reverse before completing

## REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED

| 1. HOW OBTAINED (Check) | | 2a. FILE NO. | 2b. PROGRAM CODE | 3 G-DEP ID |
|---|---|---|---|---|
| ☐ Lab. Seizure   ☐ Money Flashed   ☐ Internal Body Carry   ☐ Purchase   ☐ Seizure   ☒ Free Sample   ☐ Compliance Sample (Non-Criminal)   ☐ Other (Specify) | | C9.0-CG-115992 | | |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Chicago, Illinois | 6/4/2001 | FRANCISCO RODRIGUEZ; |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | ET AL |
|---|---|---|
| FBI | ☐ Case No. OR  ☐ Seizure No. |  |

| 7. DATE PREPARED | 8. GROUP NO. |
|---|---|
| 6/4/2001 | Squad C-1 |

| 9. Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15 Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| 1 | | Cocaine | White powder substance | | | |
| | | | contained in clear baggy | | | |
| | | | further contained in h/s | | | |
| | | | bag with date 6/4/2001 and | | | |
| | | | names of SA DePodesta & SA | | | |
| | | | Voettiner | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ?   ☒ NO (included above)   ☐ YES (if Yes, enter exhibit no. and describe original container fully)

REMARKS:

On 6/4/2001, exhibit #1 was provided to a FBI cooperating witness by Francisco Rodriguez as a free sample.  Exhibit #1 was transported to the FBI Chicago office by SAs DePodesta and Voettiner and processed into evidence.  On 6/5/2001, SA DePodesta, as witnessed by SA Voettiner, turned over exhibit #1 to the DEA North Central Laboratory for analysis.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| SA Frank L. DePodesta | SSA Stephen F. Gomez |

### LABORATORY EVIDENCE RECEIPT REPORT

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. Print or Type NAME and TITLE |
|---|---|---|
| 1 | (U.S.C.) | Frank DePodesta   SA |
| 22. SEAL   ☐ Broken  ☐ Unbroken | 23. RECEIVED BY (Signature & Date)   6.5.01 | 24. Print or Type NAME and TITLE   Mighl   SC |

### LABORATORY REPORT

25. ANALYSIS SUMMARY AND REMARKS

SEE ATTACHED

| 26. Exhibit No | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION | | | 32 AMT OF PURE DRUG | 33 RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30 Measure | 31 Unit | | |
| 01 | 138351 | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 34. ANALYST (Signature) CASON | 35. TITLE SENIOR FORENSIC CHEMIST | 36 DATE COMPLETED 19/01 |
|---|---|---|
| 37. APPROVED BY (Signature & Date)   RALPH E. CONTRELLE    5/10/01 | 38. TITLE LABORATORY DIRECTOR | 39 LOCATION CHGO 08/02/01 |

DEA Form

**U.S. Department of Justice**
Drug Enforcement Administration
North Central Laboratory

# CHEMICAL ANALYSIS REPORT

To:  Special Agent in Charge
  Federal Bureau of Investigation
  219 S. Dearborn Room 905
  Chicago, Illinois 60605

Date:  August 02, 2001

Attn:  SA Frank Jack Sodetz III

## Case Number:  281C-CG-115992

### Analysis Summary and Remarks:

**Laboratory No.** 138763
**Exhibit No.** 8 contains:  Methylphenidate Hydrochloride
**Gross Wt.:** 34.1 grams (g)
**Net Wt.:** 2.8g (28 tablets)
**Active Drug Ingredient:**  Methylphenidate Hydrochloride
**Amount of Pure Drug:**  NA
**Reserve Wt.:** 1.8g (18 tablets)

**Laboratory No.** 138764
**Exhibit No.** 9 contains:  Cocaine Hydrochloride
**Gross Wt.:** 32.2 grams (g)
**Net Wt.:** 0.97g
**Active Drug Ingredient:**  Cocaine Hydrochloride – 42%
**Amount of Pure Drug:**  0.41g
**Reserve Wt.:** 0.64g

Analyst Terry A. Dal Cason
Senior Forensic Chemist
Date Completed: 07/26/01

Approved by Ralph C. Cottrell III
Laboratory Director
Laboratory Location:  Chicago, IL kyw08/02/01

Prosecution / Orig. Office / Laboratory / Hdqtrs.................................................................Page 1 of 1

CAS

U.S. Department of Justice
Drug Enforcement Administration

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| 1. HOW OBTAINED (Check) | | | | |
|---|---|---|---|---|
| ☐ Purchase | ☒ Seizure | ☐ Free Sample | | |
| ☐ Lab. Seizure ☐ Money Flashed ☐ Compliance Sample (Non-Criminal) | | | | |
| ☐ Internal Body Carry ☐ Other (Specify) _____ | | | | |

| 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|
| 281C-CG-115992 | | |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED |
|---|---|
| Chicago, Illinois | 6/27/2001 |

5. FILE TITLE
FRANCISCO RODRIGUEZ; ET AL

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL |
|---|---|
| FBI | ☐ Case No. OR ☐ Seizure No. No. |

| 7. DATE PREPARED | 8. GROUP NO. |
|---|---|
| 6/28/2001 | Squad D-1 |

| 9. Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| 8 | | Unknown | Small pills w/ "Dan 5" and | | 33.5g | |
| | | | "5882" in clear plastic bag | | | |
| | | | in h/s bag w/date 6/27/01 | | | |
| | | | & names SA Sodetz/DePodesta | | | |
| 9 | | Cocaine | White powder sub. in clear | | 31.5g | |
| | | | baggies in h/s bag with | | | |
| | | | date 6/27/01 & names of | | | |
| | | | SA Sodetz and SA DePodesta | | | |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG?   ☒ NO (included above)   ☐ YES (if Yes, enter exhibit no. and describe original container fully)

REMARKS:

On 6/27/01, a Federal arrest warrant was executed on Frank Rodriguez, 4820 N. Avers, Chicago, Illinois. Exihibits #8 & #9 were seized from Rodriguez at the time of his arrest and transported to FBI Chicago by SAs Sodetz and DePodesta. On 6/28/01, Exihibits #8 & #9 were processed into evidence. On 6/28/01, SA Sodetz, as witnessed by SA Frank DePodesta, turned over Exihibits #8 & #9 to the DEA North Central Laboratory for anaylsis.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| SA Frank Jack Sodetz III | SSA Stephen F. Gomez |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. Print or Type NAME and TITLE |
|---|---|---|
| | 6/28/2001 | SA Frank Jack Sodetz III |
| 22. SEAL ☐ Broken ☒ Unbroken | 23. RECEIVED BY (Signature & Date) 6-28-11 | 24. Print or Type NAME and TITLE Yolonda S. Walford, Evidence Technician |

**LABORATORY REPORT**

25. ANALYSIS SUMMARY AND REMARKS

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION | | | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 34. ANALYST (Signature) | | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|---|
| 37. APPROVED BY (Signature & Date) | | 38. TITLE | 39. LAB. LOCATION |

DEA Form - 7

Previous edition dated 4/00 may be used until stock is depleted.

CAS

U.S. Department of Justice
Drug Enforcement Administration
North Central Laboratory

# CHEMICAL ANALYSIS REPORT

To:    Special Agent in Charge
       219 S. Dearborn, R00m 905
       Chicago, Illinois 60604

Date: August 02, 2001

Attn:  SA Frank Jack Sodetz III

## Case Number:  281C-CG-115992

### Analysis Summary and Remarks:

**Laboratory No.:**   138765
**Exhibit 10 contains:**   Marijuana
**Gross Wt.:**   282.8 grams (g)
**Net Wt.:**   67.5 g
**Active Drug Ingredient:**   Marijuana
**Amount of Pure Drug:**   NA
**Reserve Wt.:**   66.0 g

Analyst Terry A. Dal Cason
Senior Forensic Chemist
Date Completed: 07/25/01

Approved by Ralph C. Cottrell III
Laboratory Director
Laboratory Location:   Chicago, IL-mmm

Prosecution / Orig. Office / Laboratory / Hdqtrs / ...................................................Page 1 of 1

CAS

U.S. Department of Justice
Drug Enforcement Administration

Read instructions on Reverse
before completing

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| 1. HOW OBTAINED (Check) | | | |
|---|---|---|---|
| ☐ Purchase ☒ Seizure ☐ Free Sample | | | |
| ☐ Lab. Seizure ☐ Money Flashed ☐ Compliance Sample (Non-Criminal) | | | |
| ☐ Internal Body Carry ☐ Other (Specify) | | | |

| 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|
| 281C-CG-115992 | | |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED |
|---|---|
| Chicago, Illinois | 6/27/2001 |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL |
|---|---|
| FBI | ☐ Case No. OR ☐ Seizure No. No. |

| 5. FILE TITLE |
|---|
| FRANCISCO RODRIGUEZ; ET AL |

| 7. DATE PREPARED | 8. GROUP NO. |
|---|---|
| 6/28/2001 | Squad D-1 |

| 9. Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| 10 | | Marijuana | Green leafy substance in tupperware container further contained in h/s bag with date 6/27/01 and names of SAs Sodetz and DePodesta | | 282.0g | |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ?   ☒ NO (included above)   ☐ YES (if Yes, enter exhibit no. and describe original container fully)

REMARKS:

On 6/27/01, a Federal arrest warrant was executed on Frank Rodriguez, 4820 N. Avers, Chicago, Illinois. Exihibit #10 was seized from Rodriguez at the time of his arrest and transported to FBI Chicago by SAs Sodetz and DePodesta. On 6/28/01, Exihibit #10 was processed into evidence. On 6/28/01, SA Sodetz, as witnessed by SA Frank DePodesta, turned over Exihibit #10 to the DEA North Central Laboratory for anaylsis.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| SA Frank Jack Sodetz III | SSA Stephen F. Gomez |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) 6/28/2001 | 21. Print or Type NAME and TITLE |
|---|---|---|
| | | SA Frank Jack Sodetz III |
| 22. SEAL ☐ Broken ☒ Unbroken | 23. RECEIVED BY (Signature & Date) 6-28-71 | 24. Print or Type NAME and TITLE Yolonda S. Walford, Evidence Technician |

25. ANALYSIS SUMMARY AND REMARKS

**LABORATORY REPORT**

SEE ATTACHED

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION | | | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| 10 | 138765 | | | | | | |

| 34. ANALYST (Signature) Jerry H Dallow [illegible] 01 | 35. TITLE SENIOR FORENSIC CHEMIST | 36. DATE COMPLETED 07/25/01 |
|---|---|---|
| 37. APPROVED BY (Signature & Date) [illegible] 8/15/01 RALPH C. COTTRELL III | 38. TITLE LABORATORY DIRECTOR | 39. LAB. LOCATION CHGO mmm08/02/01 |

DEA Form - 7

Previous edition dated 4/00 [illegible]

CAS

069