# Exhibit F

# UNITED STATES DISTRICT COURT

_____NORTHERN_____ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

FRANCISCO RODRIGUEZ

CRIMINAL COMPLAINT

CASE NUMBER:

RECEIVED JUN 2 6 2001
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __June 7, 2001__ in __Cook__ county, in the __Northern__ District of __Illinois__ defendant(s) did, (Track Statutory Language of Offense)

knowingly and intentionally distribute over 50 grams of a mixture and substance containing a detectable amount of cocaine base, a Schedule II Narcotic Drug Controlled Substance

in violation of Title __21__ United States Code, Section(s) __841(a)(1)__.

I further state that I am a(n) Special Agent, FBI (Official Title) and that this complaint is based on the following facts:

See Attached affidavit

Continued on the attached sheet and made a part hereof: __X__ Yes  ____ No

Signature of Complainant
Frank Jack Sodetz III, Special Agent, FBI

Sworn to before me and subscribed in my presence,

June 26, 2001
Date

at  Chicago, Illinois
City and State

Morton Denlow, U.S. Magistrate Judge
Name & Title of Judicial Officer

*Morton Denlow*
Signature of Judicial Officer

CAS

281

**Exhibit F**

STATE OF ILLINOIS )
)
COUNTY OF COOK )

## AFFIDAVIT

I, Frank Jack Sodetz III, being duly sworn, depose and state as follows:

1. I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI), United States Department of Justice, Chicago, Illinois. I am an investigative and law enforcement officer of the United States, who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in the Title 21 of the United States Code.

2. I am a Special Agent of the FBI and have been so employed for about six months. I am currently assigned to a Drug Squad of the FBI Office in Chicago, Illinois.

3. I have received special training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code. Specifically, I have received training in all aspects of the investigation of narcotics trafficking. In connection with my duties as a FBI agent, I have been trained by and spoken with agents who have participated in numerous cocaine and marijuana trafficking investigations. Through my training and experience, and the training and experience of other agents I have spoken with, I have become familiar with the methods used by narcotics traffickers in conducting their business.

4. The following information is based upon my own personal observations, knowledge, and information received from other Federal law enforcement officers, local law enforcement officers, and a cooperating witness, referred to in this affidavit as "CW."

5. This affidavit is being submitted for the limited purpose of establishing probable cause. I have set forth only those facts I believe are necessary to establish probable cause in this

1

matter. This is not a complete statement of all I know about Francisco Rodriguez, a/k/a "Frankie Hustle," or the events described in this affidavit.

6. In about late May or early June of 2001, the CW was introduced over the telephone, and later met, Rodriguez The CW was introduced over the phone to Rodriguez by a common friend. During that initial conversation, Rodriguez offered to sell the CW quantities of both marijuana and cocaine.

7. On June 4, 2001, the CW had an unplanned meeting with Rodriguez at a restaurant in Chicago, Illinois. At this meeting, Rodriguez offered to provide the CW with free samples of both cocaine and marijuana.

8. Later that evening, Rodriguez met the CW at a McDonald's restaurant in Chicago and provided the CW with free samples of cocaine and marijuana. This meeting was observed by FBI agents and the CW was wearing a concealed recording device which recorded the conversation. Law enforcement agents searched the CW before the meeting.

9. At this meeting, Rodriguez told the CW that he worked for his cousin distributing cocaine and marijuana. When Rodriguez provided the CW with the samples of cocaine and marijuana, he told the CW that the sample of cocaine was broken off the kilogram brick and that the sample of marijuana was good because it was taken from a load of marijuana that had just arrived in Chicago from Mexico. Rodriguez told the CW to call later that evening and he would check with his cousin to obtain a price for selling the CW crack cocaine.

10. The samples of both cocaine and marijuana were field tested. Both samples yielded positive results for cocaine and marijuana respectively.

11. On June 6, 2001, Rodriguez and the CW spoke over the telephone. Rodriguez

2

told the CW that he would be able to provide the CW with three (3) ounces of crack cocaine for "three stacks," which the CW understood to mean $3,000.

12. In a phone conversation on June 6, 2001, Rodriguez told the CW that he was going to introduce him to his cousin, and that the cousin would be involved in the crack cocaine sale.

13. In a conversation in the morning of June 7, 2001, Rodriguez described the place where they would conduct the narcotics transaction as a house at 65th Place and Kedzie, near a Burger King Restaurant. Rodriguez described the house as being in the middle of the block and as the only white house with black fence.

14. Later that day, at about 11:30 a.m., the CW called Rodriguez to check on the status of their narcotics transaction. Rodriguez told the CW that he had to call his cousin to check. Shortly thereafter, Rodriguez called the CW back and told the CW that the cocaine was being cooked right now. Rodriguez told the CW that within the hour he would call back and at that time they would meet at a Kentucky Fried Chicken restaurant located at the corner of Western Avenue and Fullerton Avenue. Rodriguez told the CW that he would then get in the CW's car and they would drive to get the crack cocaine from his cousin. Rodriguez further explained that he wanted the CW to drive because if they were stopped by the police with the cocaine the CW would get in trouble and not him because he would not be driving.

15. On this same day, at approximately 1:30 p.m., Rodriguez called the CW and instructed the CW to call his cousin Pedro and provided pager telephone number (773) 231-8134, and a number that Pedro could currently be reached at (708) 609-5439. Rodriguez' cousin Pedro was later identified as Pedro Luis Castillo ("Castillo").

3

16. After speaking with Rodriguez, the CW called telephone number (773) 609-5439 and spoke to Castillo. Castillo instructed the CW to pick up Rodriguez and bring Rodriguez to his house. Castillo told the CW that Rodriguez knew where the house was. Castillo told the CW that they would sell the crack cocaine to the CW for "three stacks," which the CW understood to mean $3,000.

17. At approximately 3:45 p.m., Rodriguez called the CW and told the CW to meet him at the Kentucky Fried Chicken restaurant in about twenty (20) minutes.

18. At approximately 5:00 p.m., the CW, who was equipped with a concealed recording device, met Rodriguez at the Kentucky Fried Chicken restaurant. This meeting was observed by FBI agents and Chicago Police Department officers. Before the meeting, both the CW and the CW's vehicle were searched by law enforcement agents, and the CW was given $3,000 in buy money.

19. After arriving at the restaurant, Rodriguez parked his vehicle and got into the CW's vehicle. They then drove, followed by law enforcement agents, to 3328 West 65th Place, Chicago, Illinois.

20. As the CW drove west on 65th Place, Rodriguez pointed to the residence at 3328 West 65th Place as they passed and told the CW that this was the house they were going. He instructed the CW to drive into the alleyway and park inside the garage behind this residence.

21. As soon as they exited the vehicle inside the garage, the CW was physically searched by Rodriguez and Castillo for a wire or transmitter. The concealed recording device the CW was wearing was not discovered. As soon as they finished, Rodriguez and Castillo told the CW that they wanted to make sure that they could trust him.

4

CAS                                                                                                          285

22.  After the CW was searched, Castillo retrieved what appeared to be about 3 ounces of powder cocaine from a drawer of a workbench in the garage. Castillo showed the cocaine to the CW and allowed him to smell it. Castillo told the CW that from the smell of it the CW could tell it was the same quality as the sample of cocaine he provided the CW days earlier.

23.  Rodriguez, Castillo, and the CW then entered the residence. To enter the house, they went down a short flight of stairs. The residence is a 1 1/2 story building. The men went into a kitchen area in the basement of the house.

24.  Inside the residence was another man, but the CW was not introduced to that man. This individual did not speak much. That man was later identified by the CW as Alfredo Barrera.

25.  Inside the residence Castillo began cooking the powder cocaine into crack cocaine. First, Castillo cooked one (1) ounce of powder cocaine into crack cocaine and then cooked two (2) ounces of powder cocaine into crack cocaine. While inside the residence, the CW observed Castillo using bowls, knives, spoons, and other paraphanelia to cook the powder cocaine into crack cocaine.

26.  While Castillo was cooking the cocaine, he told the CW that he does not live at the house but that he was always there because the house was where he cooks and distributes narcotics.

27.  While at the residence, the CW overheard Castillo speaking on the telephone to someone. From the conversation the CW overheard, it appeared that Castillo arranged to sell cocaine during the call and told the person to come to the house to retrieve the cocaine. After Castillo got off the telephone, he told the CW that the person he was talking to was going to pick

up six (6) ounces of the same stuff that the CW was buying. Castillo also told the CW that he had four (4) people lined up waiting to purchase narcotics.

28.   The CW observed Castillo retrieve 2 small baggies of what appeared to be crack cocaine from a room in the front of the basement. The CW saw Castillo walk towards a stairway leading upstairs, and realized that Castillo had left the house briefly. Castillo did not have the two baggies when he returned to the kitchen area.

29.   While at the house, the CW gave Castillo the $3,000 in exchange for the crack cocaine. Castillo took the money, counted it, and then placed it in a freezer located in the kitchen area.

30.   During conversation with the CW, Castillo indicated that he had other people provide "security" for the house.

31.   Prior to leaving, the CW asked Castillo about purchasing more crack cocaine at a later date. Castillo told the CW that they would talk about that when the CW needed more, but added that whenever the CW needs more he (Castillo) would have it. As they left, Barrera told the CW to be careful.

32.   At approximately 8:12 p.m., the CW and Rodriguez departed 3328 West 65th Place, Chicago, Illinois and were followed by FBI agents and Chicago Police Department officers as they drove back to where Rodriguez' vehicle was parked. Rodriguez then entered his vehicle and drove away. The CW was followed to a pre-arranged location and provided approximately three (3) ounces of crack cocaine to the Affiant.

33.   On June 8, 2001, this crack cocaine was field tested, processed into evidence, and submitted to the Drug Enforcement Administration North Central Laboratory for analysis. The

crack cocaine had a gross weight of approximately 105.5 grams when submitted to the lab and yielded a positive reaction for the presence of crack cocaine when field tested.

45. Based on the facts set forth above, my training and experience, and the training and experience of other federal law enforcement officers with whom I have spoken, I believe that there exists probable cause that Francisco Rodriguez has violated Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT

_____
Frank Jack Sodetz III, Special Agent
Federal Bureau of Investigation

Sworn before me this 26th day
of June, 2001

*Morton Denlow* (signature)
Morton Denlow
UNITED STATES MAGISTRATE JUDGE

7

CAS                                                                                          288